

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2018-1
AUGUST 14, 2018 SESSION**

**UNITED STATES OF AMERICA**

**v.**

**ALLEN H. LOUGHRY II**

**Criminal No.  2:18-cr-00134**
18 U.S.C. § 1343
18 U.S.C. § 1341
18 U.S.C. § 1512(b)(1)
18 U.S.C. § 1503
18 U.S.C. § 1001(a)(2)

**S E C O N D
S U P E R S E D I N G
I N D I C T M E N T**

The Grand Jury charges:

**General Allegations**

**Introduction**

1.      On or about March 2, 2018, in a recorded interview in Charleston, West Virginia, defendant ALLEN H. LOUGHRY II knowingly and willfully made false statements about material matters to a Special Agent of the Federal Bureau of Investigation (the "FBI"), in an attempt to conceal, mislead, deceive, and otherwise to prevent the FBI from discovering that he had engaged in fraudulent conduct while serving as a Justice of the Supreme Court of Appeals of West Virginia (the "Supreme Court").

2.      The fraudulent conduct by defendant ALLEN H. LOUGHRY II consisted of a scheme to defraud the State of West Virginia and others and to obtain money and property through false and fraudulent pretenses, representations, and promises (the "scheme" or "scheme to defraud"). The scheme to defraud ran from approximately June 2013 through at least March 2,

2018, in Charleston, West Virginia, and elsewhere. To execute the scheme, defendant LOUGHRY, acting with an intent to defraud, misused and abused his position, power, and authority as a Justice of the Supreme Court to commit the following acts, among others:

- He falsely and fraudulently claimed mileage for trips on which he drove a Supreme Court vehicle and used a government fuel card for gasoline;

- He used government vehicles and government fuel cards for personal use under the false pretense that he was using the vehicles for official business, and lied to other Justices of the Supreme Court about his vehicle usage;

- He obtained under false pretenses, and unlawfully converted to his own personal use, a valuable and historic desk that belonged to the Supreme Court and which he took to his residence for a "home office;" and

- He attempted to conceal his fraudulent conduct by lying about his actions to government investigators and others, attempting to deflect attention away from himself by accusing others of malfeasance, and engaging in other fraudulent conduct.

3.      Furthermore, in October 2017, after the news media inquired about the costs associated with renovating and refurbishing his office at the Supreme Court, defendant ALLEN H. LOUGHRY II attempted to corruptly influence testimonial evidence of a Supreme Court employee in an imminent federal grand jury investigation into excessive and fraudulent expenditures by the Supreme Court.

4.      Later, beginning in early December 2017 and continuing through May 24, 2018, defendant ALLEN H. LOUGHRY II knowingly and corruptly endeavored to influence, obstruct, and impede a pending federal grand jury investigation on his unlawful conversion of the valuable and historic desk he took to his home.

2

## Background

At all times material to this Indictment:

### The Supreme Court of Appeals of West Virginia.

5.     The Supreme Court was the highest state court in West Virginia. The Supreme Court considered and decided appeals from the State's trial courts of general jurisdiction, that is, the circuit courts of the 55 counties in West Virginia. The Supreme Court heard arguments for most appeals in the Chamber of the Supreme Court, located in the East Wing of the State Capitol in Charleston, West Virginia. Occasionally, the Supreme Court traveled to other locations in the State to hear arguments.

6.     In addition to deciding appeals, the Supreme Court had administrative and regulatory responsibilities to oversee the administration of the State's lower courts, including the circuit courts, family courts, magistrate courts, and drug courts. The Supreme Court also created and adopted various rules governing practice and procedure, as well as a Code of Judicial Conduct, Rules of Judicial Disciplinary Procedure, and Rules of Lawyer Disciplinary Procedure.

7.     The Chamber of the Supreme Court was designed by Cass Gilbert, a noted and nationally-known architect who designed many prominent buildings in the United States, including the United States Supreme Court building in Washington D.C., the Woolworth Building in New York City, and the State Capitol of West Virginia.

8.     In addition to designing the State Capitol and the Chamber of the Supreme Court, Cass Gilbert selected or approved furnishings for the State Capitol. When the State Capitol was dedicated on June 20, 1932, the Supreme Court had five "executive" desks for use by Justices. These desks became known as "Cass Gilbert" desks, either because Cass Gilbert had selected or approved them for use by the Supreme Court or because the desks were present in the Supreme

3

Court's offices in the East Wing of the State Capitol when it was first dedicated and opened for use in 1932. The Cass Gilbert desks were well known by employees of the Supreme Court and were valued for their craftsmanship and historical significance.

9.      The Supreme Court comprised five Justices who were elected to 12-year terms by staggered, statewide elections. Each Justice maintained an office in the State Capitol in Charleston, West Virginia. To assist them with their duties, each Justice had an administrative assistant and up to four law clerks working for him or her.

10.      The Justices elected one of their members to serve as Chief Justice. Until April 2017, the Chief Justice served a one-year term. On or about April 5, 2017, the Justices voted to change the rules to provide for a four-year term as Chief Justice and to allow for re-election to subsequent four-year terms.

11.      Occasionally, the Justices traveled within West Virginia and other places outside the State to attend conferences and seminars, give speeches, or fulfill administrative duties as part of the Supreme Court's oversight role over the State's lower courts. The Supreme Court kept a fleet of vehicles for use by its employees, including the Justices, for business travel, but not for personal travel.

12.      The Supreme Court had a process for reserving its vehicles and kept an electronic record showing who had reserved a particular vehicle. When Supreme Court employees, including Justices, needed a vehicle, their reservation of the vehicle was electronically recorded.

13.      Certain vehicles in the Supreme Court's fleet were assigned for exclusive use by the Justices. Each of those vehicles had a government fuel card assigned to it. The government fuel card was only to be used to purchase gasoline or other necessary automotive items. The card should not have been used to buy personal items.

4

14.     Each of the vehicles assigned for use by the Justices also had an "E-Z Pass" transponder assigned to it. E-Z Pass was an electronic payment system for tolls on highways such as the West Virginia Turnpike. The Supreme Court had a prepaid E-Z Pass account from which a toll was automatically deducted each time the E-Z Pass transponder passed through a toll gate.

15.     When Supreme Court employees, including the Justices, traveled for business purposes, the State reimbursed them for their legitimate business expenses. No one, however, was entitled to receive "double" reimbursement, that is, reimbursement from two different sources for the same expense.

16.     Nor was any employee allowed to claim and receive reimbursement for expenses he or she had not actually incurred. For example, Justices could not claim reimbursement for mileage, as if they had driven a personal vehicle on business, if in fact they had traveled in a government vehicle and used a government fuel card to pay for gasoline.

*Defendant ALLEN H. LOUGHRY II*

17.     Defendant ALLEN H. LOUGHRY II was a lawyer and a Justice of the Supreme Court. He graduated from law school in December 1997, receiving a Juris Doctor degree from Capital University Law School in Columbus, Ohio. He obtained three additional law degrees, including a Doctoral in Juridical Science degree from American University, Washington College of Law, in 2003.

18.     Following graduation from law school and admission to the West Virginia Bar, defendant ALLEN H. LOUGHRY II served as an Assistant Attorney General in the Office of the West Virginia Attorney General until 2003. From May 2003 through December 2012, he served as a law clerk for the Supreme Court, with an office in the State Capitol in Charleston, West

Virginia. In November 2012, defendant LOUGHRY was elected to the Supreme Court. He took office on January 1, 2013, and continued serving as a Justice until approximately June 8, 2018.

19.     Beginning on January 1, 2017, and continuing until February 16, 2018, defendant ALLEN H. LOUGHRY II served as the Chief Justice of the Supreme Court.

20.     Prior to his election and while serving as a law clerk, defendant ALLEN H. LOUGHRY II had a Cass Gilbert desk in his office on the Fourth Floor of the East Wing of the State Capitol. When he became a Justice in 2013, defendant LOUGHRY moved into an office (also referred to as "chambers") on the Third Floor of the East Wing of the State Capitol; those chambers contained another Cass Gilbert desk, which was virtually identical to the Cass Gilbert desk he had as a law clerk.

21.     Defendant ALLEN H. LOUGHRY II wrote a book that was published in 2006, while he was a law clerk for the Supreme Court, and which was based on his doctoral thesis at American University. The book, which was titled: "*Don't Buy Another Vote, I Won't Pay for a Landslide: The Sordid and Continuing History of Political Corruption in West Virginia,*" contained a lengthy catalogue of crimes committed by West Virginia public officials, including judges and other elected officials.

22.     While he was a law clerk, and also after he became a Justice, defendant ALLEN H. LOUGHRY II attended book-signing events in West Virginia, where he autographed copies of his book for people who had purchased it.

23.     Defendant ALLEN H. LOUGHRY II cited his book in his biography on the Supreme Court's website. His biography also noted that he was a frequent speaker on issues of government, ethics reform, politics, history, education, and the election process.

6

**The Fraudulent Conduct**

*Defendant ALLEN H. LOUGHRY II used a government vehicle as a means to defraud private institutions, by claiming, and accepting payment for, mileage expenses he did not incur.*

<u>The American University Fraud</u>

24.     While serving as a Justice, defendant ALLEN H. LOUGHRY II defrauded American University in Washington, D.C. by claiming mileage expenses for a trip on which he planned to use and did use a Supreme Court vehicle and then later accepting reimbursement for that mileage. Specifically:

a.     In July 2013, defendant ALLEN H. LOUGHRY II was invited by American University, Washington College of Law, to travel to Washington, D.C. for a dinner and celebration scheduled for October 4, 2013. Defendant LOUGHRY was asked to be the keynote speaker and was told he would receive a "Distinguished Alumnus Award." He accepted the invitation.

b.     American University had a travel policy that forbade reimbursement for expenses unless they were necessary, reasonable, appropriate, and allowable. American University would not pay travel expenses that had been paid or would be paid by an outside source. The policy applied to non-employees such as lecturers when the University agreed to pay any travel expenses.

c.     In an email on September 3, 2013, a representative of American University asked defendant ALLEN H. LOUGHRY II if he was "driving to DC? If so I will arrange for you to be compensated for your mileage." In an email on September 10, 2013, the representative asked defendant LOUGHRY to send "information on mileage." The representative also informed him that American University would pay for a hotel for a night so he would not have to drive back to West Virginia after the event.

7

d.     Defendant ALLEN H. LOUGHRY II replied on September 13, 2013, noting that "Mapquest shows that it is 356 miles from my home to [American University Washington College of Law]'s . . . campus."

e.     For the dinner and celebration at American University, on October 4, 2013, defendant ALLEN H. LOUGHRY II drove with his family in one of the Supreme Court's vehicles, a 2012 Buick LaCrosse (the "Buick LaCrosse") to Washington, D.C. At the event, defendant ALLEN H. LOUGHRY II spoke to the audience about honesty and integrity in government.

f.     Defendant ALLEN H. LOUGHRY II and his family spent two nights at a hotel in Washington, D.C. They visited a museum on October 5, 2013, and an amusement park on October 6, 2013, before heading home in the Buick Lacrosse to Charleston, West Virginia. The hotel invoice for defendant LOUGHRY's stay was $591.20 for two nights, a rate of $295.60 per night. He paid by personal credit card.

g.     Defendant ALLEN H. LOUGHRY II used the government fuel card assigned to the Buick LaCrosse to buy gasoline while traveling to Washington, D.C. and during his return trip to West Virginia.

h.     Defendant ALLEN H. LOUGHRY II never disclosed to American University that he had traveled to and from Washington, D.C. in one of the Supreme Court's vehicles and that he used a government fuel card to pay for gasoline.

i.     On or about November 11, 2013, American University sent a reimbursement check via the mail to defendant ALLEN H. LOUGHRY II. The check was for $496.18, which included $200.58 for mileage for 355 miles and $295.60 for the one

8

night in the hotel that American University had agreed to pay. Defendant LOUGHRY deposited the check into his personal account on November 15, 2013.

The Pound Civil Justice Institute Fraud

25.     Similarly, defendant ALLEN H. LOUGHRY II defrauded the Pound Civil Justice Institute (the "Pound Institute"), a national legal "think tank," based in Washington, D.C., for mileage expenses related to his attendance at a forum for state appellate judges in Baltimore, Maryland. Specifically:

a.     Defendant ALLEN H. LOUGHRY II traveled with his family in late July 2014 to Baltimore and returned to Charleston, West Virginia, in another Supreme Court vehicle, a 2009 Buick Lucerne (the "Buick Lucerne"). He used the assigned government fuel card to buy gasoline while traveling to Baltimore, and during his return trip to West Virginia. The Pound Institute paid for a hotel room for two nights for defendant LOUGHRY and paid a per diem for his meals.

b.     After returning to West Virginia, defendant ALLEN H. LOUGHRY II submitted a claim for reimbursement from the Pound Institute for mileage and parking. The claim was false and fraudulent because defendant LOUGHRY had not incurred any mileage expense, inasmuch as he traveled to and from Baltimore in the Buick Lucerne.

c.     As a result, on or about August 29, 2014, the Pound Institute sent a reimbursement check via the mail to defendant ALLEN H. LOUGHRY II. The check was for $488.60, which included $402.60 for mileage and $86.00 for parking. Defendant LOUGHRY deposited the check into his personal account on September 3, 2014.

9

*Defendant ALLEN H. LOUGHRY II defrauded the State of West Virginia,*
*by using a Supreme Court vehicle and/or a government fuel card for personal use.*

26.     Between July 2013 and July 2017, and while he was a Justice, defendant ALLEN H. LOUGHRY II defrauded the State of West Virginia by driving a Supreme Court vehicle for personal use, and by using a government fuel card to purchase gasoline for personal use, all under the false pretense that he would and did use the vehicle for official business. During this time, defendant LOUGHRY had his own sets of keys for the Buick LaCrosse and the Buick Lucerne.

27.     Between July 2013 and July 2017, defendant ALLEN H. LOUGHRY II reserved a Supreme Court vehicle sometimes, but there were occasions he did not reserve a vehicle yet still used one of the vehicles. Rarely did defendant LOUGHRY provide a destination for his travels. Also, defendant LOUGHRY reserved a Supreme Court vehicle for extended periods in December 2013–January 2014, December 2014–January 2015, and December 2015. Reservation records and other records, including the government fuel card and personal credit cards, showed that defendant LOUGHRY invariably used the vehicles over weekends and/or during holidays.

28.     His use of a Supreme Court vehicle for personal use included trips from Charleston, Kanawha County, West Virginia, to Parsons, Tucker County, West Virginia, where defendant ALLEN H. LOUGHRY II grew up and owned property, and where his parents lived; and trips to White Sulphur Springs, Greenbrier County, West Virginia, to attend book signing events at The Greenbrier Resort for his book, "*Don't Buy Another Vote, I Won't Pay for a Landslide.*" During these occasions and on others, defendant LOUGHRY used a government fuel card, which was assigned to the Supreme Court vehicle, to pay for gasoline for his personal use.

29.     Specific occasions of personal use of a Supreme Court vehicle and/or personal use of a government fuel card (designated as "Card No. _____") included at least the following:

10

a.      July 12–13, 2013, a Friday and Saturday, utilizing the Buick LaCrosse and Card No. 0006 for personal use; personal calendar showing "anniversary" on July 13, 2013.

b.      August 22–23, 2013, a Thursday and Friday, utilizing the Buick LaCrosse and Card No. 0006; personal calendar showing no business purpose on those dates.

c.      November 28, 2013, Thanksgiving Day, utilizing Card No. 0006 to buy gasoline for personal use.

d.      December 7–8, 2013, Saturday and Sunday, utilizing the Buick LaCrosse and Card No. 0006 for personal use; personal calendar showing no business purpose on those dates.

e.      December 14, 2013, a Saturday, utilizing the Buick LaCrosse, Card No. 0006, and an EZ Pass transponder for personal use by driving the Buick LaCrosse to White Sulphur Springs, West Virginia, for a book signing event at The Greenbrier Resort.

f.      December 21–22, 2013, Saturday and Sunday, utilizing the Buick LaCrosse and Card No. 0006 for personal use; personal calendar showing no business purpose.

g.      December 30, 2013, to January 1, 2014, utilizing the Buick LaCrosse and Card No. 0006 for personal use; personal calendar showing no business purpose on those dates.

h.      January 19, 2014, the Sunday of Martin Luther King Holiday Weekend, utilizing the government fuel card assigned to the Supreme Court's Buick Lucerne (Card No. 0001) for personal use.

i.      January 29, 2014, utilizing the Buick LaCrosse for personal use by driving the Buick LaCrosse to attend a hearing for his father, in Tucker County, West Virginia, and later, fraudulently attributing the trip as business-related.

j.      March 22–23, 2014, a Saturday and Sunday, utilizing the Buick LaCrosse, Card No. 0016, and an EZ Pass transponder for personal use by driving the Buick LaCrosse to White Sulphur Springs, West Virginia, for a book signing event at The Greenbrier Resort, and then traveling to Parsons, Tucker County, West Virginia.

k.      July 4, 2014, Independence Day, to July 6, 2014, utilizing the Buick LaCrosse and Card No. 0016 for personal use; personal calendar showing no business purpose on those dates.

l.      August 15–17, 2014, Friday through Sunday, utilizing the Buick Lucerne and Card No. 0001 for personal use; personal calendar showing no business purpose.

m.      December 20, 2014, a Saturday, utilizing the Buick Lucerne, Card No. 0001, and an EZ Pass transponder for personal use by driving the Buick Lucerne to White Sulphur Springs, West Virginia, for a book signing event at The Greenbrier Resort.

n.      January 2–3, 2015, a Friday and Saturday, utilizing the Buick Lucerne and Card No. 0001 for personal use; personal calendar showing no business purpose.

o.      March 14, 2015, a Saturday, utilizing the Buick LaCrosse, Card No. 0016, and an EZ Pass transponder for personal use by driving the Buick LaCrosse to White Sulphur Springs, West Virginia, for a book signing event at The Greenbrier Resort.

p.      December 11–12, 2015, Friday and Saturday, utilizing the Buick Lucerne and Card No. 0001 for personal use by driving the Buick Lucerne from Lewis County,

12

West Virginia, to Elkins, Randolph County, West Virginia, to go to the Elkins Theatre Company.

q.      September 2–4, 2016, Friday through Sunday of Labor Day Holiday Weekend, utilizing the Buick LaCrosse and Card No. 0016 for personal use; personal calendar showing no business purpose on those days.

r.      July 8, 2017, a Saturday, using a government fuel card assigned to the Buick LaCrosse, Card No. 0030, for personal use.

30.      By using the government fuel card to buy gasoline, defendant ALLEN H. LOUGHRY II transmitted and caused the transmission of data, that is, account and transaction information, from the gas station to electronic databases in the office of the card provider, Wright Express, Inc. ("WEX") in Aurora, Colorado. WEX subsequently billed the Supreme Court for all fuel purchases, including defendant LOUGHRY's fraudulent transactions.

31.      The State of West Virginia then paid WEX for defendant ALLEN H. LOUGHRY II's fraudulent fuel card transactions to buy gasoline. Thus, the State of West Virginia paid for defendant LOUGHRY's personal travel.

*Defendant ALLEN H. LOUGHRY II defrauded the State of West Virginia by obtaining a Cass Gilbert desk through false and fraudulent pretense and unlawfully converting it to his personal use.*

32.      The chambers of defendant ALLEN H. LOUGHRY II were scheduled for renovation and refurbishing in the late summer of 2013. Before the renovation and refurbishing of his chambers occurred, defendant LOUGHRY arranged to have the Cass Gilbert desk in his chambers moved to his private residence in Charleston, West Virginia, for his personal use.

33.      The Justices often worked at their homes outside of normal business hours. To facilitate the Justices' working at their homes, the Supreme Court arranged to have computers

13

and printers installed in the homes. But there was never a policy or practice allowing for a Justice to take a desk from the Supreme Court, much less a Cass Gilbert desk, to furnish a home office.

34.      Defendant ALLEN H. LOUGHRY II had no authority to take the Cass Gilbert desk. Nonetheless, acting under the false pretense that he had such authority, he arranged for a state-contracted moving company to move the Cass Gilbert desk to his home on a State holiday, June 20, 2013, when other Supreme Court employees were not working. The private moving company had been scheduled only to move furniture from the Supreme Court to a warehouse in another part of Charleston, West Virginia.

35.      Defendant ALLEN H. LOUGHRY II did not inform the other Justices or any Supreme Court employee that he planned to take the Cass Gilbert desk. Nor did he tell them that he had in fact taken a Cass Gilbert desk to his home.

36.      The State of West Virginia paid the moving company approximately $836 in July 2013 for moving furniture on June 20, 2013, including moving the Cass Gilbert desk and a leather couch to defendant ALLEN H. LOUGHRY II's home in Charleston, West Virginia. The State paid the moving company via check, delivered in the mail.

*Defendant ALLEN H. LOUGHRY II attempted to conceal*
*his prior fraudulent conduct and obstructed justice.*

37.      Beginning in August 2016 and continuing up through at least March 2, 2018, defendant ALLEN H. LOUGHRY II took steps to conceal, mislead, misdirect, and otherwise to deceive, in order to prevent others from learning about the fraudulent conduct he had previously engaged in. This pattern of concealment, misdirection, and deception began in late-August 2016, in a dispute with another Justice about vehicle usage.

14

38.     On August 25, 2016, one of the Justices of the Supreme Court wrote memoranda to the Administrative Director of the Supreme Court, asking very specific questions about instances when defendant ALLEN H. LOUGHRY II had reserved a Supreme Court vehicle in 2013–2016. All of the Justices, including defendant LOUGHRY received a copy of the memoranda.

39.     In response, on August 26, 2016, defendant ALLEN H. LOUGHRY II wrote his own memorandum, questioning vehicle usage by other Justices. He also stated, "I unhesitatingly assure each of you that on the dates mentioned in [the other Justice's] various memoranda to [the Administrative Director], I was acting in my capacity as a Justice of this Court in utilizing a Court vehicle."

40.     As explained above, however, defendant ALLEN H. LOUGHRY II's statement to his fellow Justices was not true, in that on many occasions after becoming a Justice he had indeed used a Supreme Court vehicle and a government fuel card for personal use.

41.     Following the exchange of memoranda in August 2016, the Justices met in an administrative conference in early-September 2016 to discuss having a formal written policy for vehicle usage. The Justices did not adopt a formal written policy, but thereafter defendant ALLEN H. LOUGHRY II stopped using the Supreme Court's reservation system to reserve and/or check out a vehicle. Nonetheless, he continued to use Supreme Court vehicles and the government fuel cards. At least one of those instances involved his use of the government fuel card for personal use.

42.     On October 18, 2017, the Supreme Court received a media inquiry about extraordinary spending by the Supreme Court to renovate and refurbish the chambers of defendant ALLEN H. LOUGHRY II. The next day, defendant LOUGHRY met with a Supreme Court

15

employee who was responsible for managing the Supreme Court's facilities and equipment and corruptly attempted to get her to "remember" facts about directions he purportedly had given on the amounts to spend on his chambers.

43.     On October 20, 2017, defendant ALLEN H. LOUGHRY II called the then-United States Attorney for the Southern District of West Virginia to report his own concerns about excessive spending directed by a former Administrative Director of the Supreme Court, spending which defendant LOUGHRY believed was unauthorized or otherwise inappropriate.

44.     Beginning in early November 2017, the news media published and broadcast numerous reports about extraordinary spending by the Supreme Court, including hundreds of thousands of dollars spent on renovating and refurbishing the chambers of defendant ALLEN H. LOUGHRY II and the chambers of other Justices.

45.     In response to the media reports, defendant ALLEN H. LOUGHRY II continued to engage in a pattern of deceit and misdirection by, among other things, misrepresenting to members of the media his role in the renovation and refurbishing of his chambers and blaming the former Administrative Director for unauthorized spending.

46.     As result of his call on October 20, 2017, to the United States Attorney, defendant ALLEN H. LOUGHRY II met on November 20, 2017, with a Special Agent of the FBI and a representative of the United States Attorney's Office. The FBI and the United States Attorney's Office were (and are) agencies of the United States Department of Justice.

47.     In the meeting on November 20, 2017, and as a part of his pattern of deceit and misdirection, defendant ALLEN H. LOUGHRY II blamed the former Administrative Director for what defendant LOUGHRY acknowledged were "outrageous expenditures" by the Supreme

Court. At defendant LOUGHRY's direction, the Supreme Court gave records and information to the FBI about alleged improper spending.

48.     As a result of the November 20, 2017 meeting with defendant ALLEN H. LOUGHRY II, the FBI and the United States Attorney's Office initiated a criminal investigation into the possible misuse of state funds by members of the Supreme Court to determine if any federal crimes had been committed and, if so, by whom.

49.     On November 26, 2017, a member of news media reported that a leather couch was missing from the Supreme Court's offices in the State Capitol. The next day, on November 27, 2017, defendant ALLEN H. LOUGHRY II arranged for Supreme Court employees to remove a leather couch from his home in Charleston and return it to the Supreme Court.

50.     Three days after having the leather couch removed from his home and returned to a Supreme Court warehouse, defendant ALLEN H. LOUGHRY II arranged to have Supreme Court employees return to his home to remove the Cass Gilbert desk that had been in his home for more than four years.

51.     Defendant ALLEN H. LOUGHRY II falsely told the Supreme Court employees who removed the leather couch and the Cass Gilbert desk from his home that he was allowed to have them in his home. Defendant LOUGHRY claimed the Justices were allowed to have home offices and falsely represented that the former Administrative Director had arranged for defendant LOUGHRY to have the Cass Gilbert desk moved to his home. Defendant LOUGHRY also tried to mislead one of the employees into believing that he took the leather couch to his home because the previous owner did not want it, when in fact defendant LOUGHRY had not talked to the previous owner before he took the couch home.

52.     Defendant ALLEN H. LOUGHRY II falsely stated to another Supreme Court employee that the former Administrative Director had made arrangements to move furniture to defendant LOUGHRY's home. And defendant LOUGHRY told the news media through a spokesperson that the Supreme Court had a longstanding practice of affording the Justices the opportunity to have a home office furnished with computers and furniture to suit their needs.

53.     The Supreme Court, however, had no oral or written policy that would have allowed defendant ALLEN H. LOUGHRY II to establish a home office with furniture from the Supreme Court. None of the other Justices had taken desks or couches from the Supreme Court to their homes. Indeed, until late-November 2017, the other Justices and the Supreme Court employee who was responsible for managing the Supreme Court's facilities and equipment did not know that defendant LOUGHRY had a Cass Gilbert desk in his home.

54.     After the media reporting about the leather couch and the Cass Gilbert desk, and no later than December 4, 2017, the federal criminal investigation expanded to include determining whether any federal laws had been violated in connection with, among other things, defendant ALLEN H. LOUGHRY's keeping the leather couch and Cass Gilbert desk at his home for over four years. The federal criminal investigation also expanded to include reviewing the use of Supreme Court vehicles by any employee, including defendant LOUGHRY.

55.     No later than December 4, 2017, the federal criminal investigation became a grand jury investigation that involved using the federal grand jury process to obtain records and information. Thereafter the investigating agents, including FBI Special Agents, acted as the arm of the grand jury, and all of their investigative actions were undertaken in direct support of the grand jury investigation.

56.     The goals of the federal criminal/grand jury investigation included determining whether any Justice or other employee of the Supreme Court had knowingly and without authority converted, or intentionally misapplied, government funds and property or had otherwise committed crimes in connection with the use of state funds and property.

57.     It was material to the federal criminal/grand jury investigation to determine whether defendant ALLEN H. LOUGHRY II, among other things, had:

- Used a government vehicle for personal or primarily personal use;

- Unlawfully converted or stole government property, that is, the Cass Gilbert desk, and attempted so to do;

- Understood and had knowledge of the significance and value of the desk he took from the Supreme Court for use in his home; more specifically, whether he knew it was a Cass Gilbert desk or a desk described as a Cass Gilbert desk at the time he took it.

58.     In early December 2017, defendant ALLEN H. LOUGHRY II wrote an editorial that the Charleston newspaper published on December 7, 2017. In that editorial, defendant LOUGHRY accused the former Administrative Director of "a decade of misfeasance and mismanagement" and "misappropriation of state money." Defendant LOUGHRY also stated that he had called the United States Attorney's Office to hold the former Administrative Director accountable for his misconduct, claimed he wanted to "change the culture and perception of corruption that has plagued our government for countless generations," and asserted that he would "not stand for excessive and wasteful spending."

59.     In approximately mid-February 2018, defendant ALLEN H. LOUGHRY II asked another Supreme Court employee to find copies of invoices from the private moving company that had moved the Cass Gilbert desk to his home. Specifically, defendant LOUGHRY asked for and received a copy of an invoice reflecting services provided by the private moving company on

December 21, 2012. That invoice did not reflect any movement of furniture to defendant LOUGHRY's home.

60.     Nonetheless, defendant ALLEN H. LOUGHRY II relied on that invoice to create a false story that the Cass Gilbert desk had been moved to his home on December 21, 2012—when he was law clerk and not yet sworn in as a Justice—and at a time when he would have had no authority to order furniture to be moved to his home. After obtaining the copy of the invoice, defendant LOUGHRY repeated the false story to other Supreme Court employees.

61.     Also, in mid- to late-February 2018, two of the Supreme Court employees who helped remove the leather couch and Cass Gilbert desk from the home of defendant ALLEN H. LOUGHRY II, told an FBI Special Agent and other investigators the other false story created by defendant LOUGHRY, that the former Administrative Director had told defendant LOUGHRY it was okay to take the Cass Gilbert desk to his home.

62.     As part of the federal criminal/grand jury investigation, an FBI Special Agent and other investigators interviewed defendant ALLEN H. LOUGHRY II on March 2, 2018, at the Office of the United States Attorney in Charleston, West Virginia. The FBI Special Agent recorded the interview with the consent of defendant LOUGHRY and his lawyer.

63.     During the interview, defendant ALLEN H. LOUGHRY II denied he had ever used a government vehicle for personal use. The statement was false, and defendant LOUGHRY knew it was false at the time he made it.

64.     In addition, during the interview defendant ALLEN H. LOUGHRY II said that the desk from the Supreme Court went to his home in December 2012 when he was a law clerk, not a Justice, and that he had no individual authority to direct anyone to move the desk to his home, and that the desk was one he had used for approximately ten years as a law clerk. The statement

20

was false in that the movement of the desk to his home occurred in 2013 at his insistence, not December 2012 under someone else's direction and authority.

65.     Also during the interview, defendant ALLEN H. LOUGHRY II stated he had not known the desk taken from the Supreme Court and placed in his home was a Cass Gilbert desk or even a desk described as a Cass Gilbert desk. The statement was false, and defendant LOUGHRY knew it was false at the time he made it.

66.     On May 24, 2018, one of the Supreme Court employees to whom defendant ALLEN H. LOUGHRY had given the false story about the Cass Gilbert desk moving to his home in December 2012, testified before a federal grand jury. The employee repeated the false narrative created by defendant LOUGHRY—that based on a review of the private moving company's invoices, the Cass Gilbert desk had been moved to defendant LOUGHRY's home in December 2012, at a time when he was merely a law clerk and not a Justice and had no authority to order anyone to move furniture to his home.

### The Charges

### Count One
### (Wire Fraud – False and Fraudulent Mileage Claim)

67.     Paragraphs 1 - 66 are incorporated by reference here.

68.     On or about September 13, 2013, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendant ALLEN H. LOUGHRY II, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, and pictures for the

21

purpose of executing the scheme, that is, defendant LOUGHRY sent an email from Charleston, West Virginia, to a representative of American University in Washington, D.C., about the mileage from his home to American University, as if he planned to drive a personal vehicle for an event to be held on October 4, 2013, in Washington, D.C.

    In violation of Title 18, United States Code, Section 1343.

## Counts Two and Three
### (Mail Fraud – False and Fraudulent Mileage Claims)

69.     Paragraphs 1 – 66 are incorporated by reference here.

70.     On or about the dates listed below for each count, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing the scheme and attempting so to do, caused to be delivered by mail, according to the direction thereon, the matters and things described below.

| Count | Approx. Date | Mailed Item | From | To |
|-------|-------------|-------------|------|-----|
| 2 | At some time after Nov. 11, but not later than Nov. 15, 2013 | Check from American Univ. for $496.18, payable to defendant LOUGHRY, which included $200.58 to pay for a fraudulent mileage expense. | Washington, DC | Charleston, WV |
| 3 | At some time after Aug. 29, 2014, but not later than Sep. 3, 2014 | Check from Pound Civil Justice Institute for $488.60, payable to defendant LOUGHRY, which included $402.60 to pay for a fraudulent mileage expense. | Washington, DC | Charleston, WV |

All in violation of Title 18, United States Code, Section 1341.

**Counts Four through Eighteen**
**(Wire Fraud – Personal Use of Supreme Court Vehicles and Government Fuel Cards)**

71.     Paragraphs 1 - 66 are incorporated by reference here.

72.     On or about the dates listed below for each count, at or near the places listed below, each within the Southern District of West Virginia, and elsewhere, defendant ALLEN H. LOUGHRY II, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals and pictures for the purpose of executing the scheme, that, is defendant LOUGHRY used a government fuel card to purchase gasoline for personal use, and thereby caused interstate wire communications from the gas stations indicated below to electronic databases in WEX's office in Aurora, Colorado.

| Count | Approx. Date and Time | Gasoline Purchased via Wire Transmission |
|:-----:|:---------------------:|------------------------------------------|
| 4 | Thursday, Aug. 22, 2013 8:01 p.m. | Purchase of 19.425 gallons of unleaded plus gasoline for $71.08 at ExxonMobil, Washington St. ("East End Exxon"), Charleston, Kanawha County, West Virginia. |
| 5 | Thursday, Thanksgiving Day Nov. 28, 2013 8:31 p.m. | Purchase of 11.206 gallons of unleaded plus gasoline for $39.21 at East End Exxon, Charleston, Kanawha County, West Virginia. |
| 6 | Saturday, Dec. 14, 2013 4:57 p.m. | Purchase of 19.503 gallons of unleaded gasoline for $65.51 at ExxonMobil, Harper Rd., Beckley, Raleigh County, West Virginia. |
| 7 | Sunday, Dec. 22, 2013 6:00 p.m. | Purchase of 19.102 gallons of unleaded gasoline for $63.02 at Kroger gas station, Elkview, Kanawha County, West Virginia. |
| 8 | Monday, Dec. 30, 2013 4:29 p.m. | Purchase of 18.244 gallons of unleaded plus gasoline for $63.84 at East End Exxon, Charleston, Kanawha County, West Virginia. |

24

| Count | Approx. Date and Time | Gasoline Purchased via Wire Transmission |
|:---:|:---:|:---|
| 9 | Wednesday, Jan. 1, 2014 12:49 p.m. | Purchase of 11.175 gallons of unleaded gasoline for $37.98 at East End Exxon, Charleston, Kanawha County, West Virginia. |
| 10 | Sunday, Jan. 19, 2014 8:17 p.m. | Purchase of 13.55 gallons of unleaded plus gasoline for $46.33 at ExxonMobil, MacCorkle Ave., Charleston, Kanawha County, West Virginia. |
| 11 | Sunday, Mar. 23, 2014 6:03 p.m. | Purchase of 18.667 gallons of unleaded gasoline for $69.05 at ExxonMobil, Amma Road, Amma, Clay County, West Virginia. |
| 12 | Sunday, Mar. 23, 2014 8:58 p.m. | Purchase of 12.636 gallons of unleaded plus gasoline for $46.99 at East End Exxon, Charleston, Kanawha County, West Virginia. |
| 13 | Friday, Jul. 4, 2014 6:42 p.m. | Purchase of 7.033 gallons of unleaded gasoline for $26.44 at Go-Mart, Frame Road, Elkview, Kanawha County, West Virginia. |
| 14 | Sunday, Jul. 6, 2014 5:15 p.m. | Purchase of 9.35 gallons of unleaded plus gasoline for $37.68 at BP, Washington St. ("East End BP"), Charleston, Kanawha County, West Virginia. |
| 15 | Saturday, Dec. 20, 2014 10:41 a.m. | Purchase of 17.582 gallons of unleaded gasoline for $47.45 at East End BP, Charleston, Kanawha County, West Virginia. |
| 16 | Friday, Jan. 2, 2015 9:26 a.m. | Purchase of 14.011 gallons of unleaded gasoline for $35.01 at East End Exxon, Charleston, Kanawha County, West Virginia. |
| 17 | Saturday, Jan. 3, 2015 6:17 p.m. | Purchase of 18.642 gallons of 18.642 gasoline for $42.86 at Go-Mart, Frame Road, Elkview, Kanawha County, West Virginia. |
| 18 | Saturday, Mar. 14, 2015 5:11 p.m. | Purchase of 11.087 gallons of unleaded gasoline for $26.60 at Go-Mart, MacCorkle Ave., Charleston, Kanawha County, West Virginia. |

All in violation of Title 18, United States Code, Section 1343.

## Count Nineteen
### (Mail Fraud – The Cass Gilbert Desk)

73.     Paragraphs 1 – 66 are incorporated by reference here.

74.     On or about July 10, 2013, at or near Cross Lanes, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing the scheme and attempting so to do, caused to be delivered by mail according to the direction thereon, that is, an envelope containing a check from the State Treasury of West Virginia, payable to a moving company in Cross Lanes, West Virginia, for moving the Cass Gilbert desk to defendant LOUGHRY's home in Charleston, West Virginia, on June 20, 2013.

In violation of Title 18, United States Code, Sections 1341.

**Count Twenty**
**(Witness Tampering)**

75.     Paragraphs 1 – 66 are incorporated by reference here.

76.     On or about October 19, 2017, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II knowingly attempted to corruptly persuade and engaged in misleading conduct toward another person, with intent to influence and prevent the testimony of a person in an official proceeding, that is, defendant LOUGHRY, having reason to believe a federal grand jury investigation into improper use of Supreme Court funds and property, including excessive spending by the Supreme Court on office renovations and refurbishing, was likely to be instituted in the near future, attempted to coach a Supreme Court employee by planting false facts about purported prior conversations between the employee and defendant LOUGHRY that concerned the renovation costs of defendant LOUGHRY's judicial office—conversations that did not, in fact, occur—and did so with the intent to dishonestly influence and prevent future truthful testimony by the employee before the federal grand jury.

In violation of Title 18, United States Code, Section 1512(b)(1).

## Count Twenty-One
### (Wire Fraud – The Cass Gilbert Desk)

77.     Paragraphs 1 – 66 are incorporated by reference here.

78.     On or about November 28, 2017, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, and elsewhere, defendant ALLEN H. LOUGHRY II, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, and pictures for the purpose of executing the scheme, that is, defendant LOUGHRY caused another Supreme Court employee to send an email to a reporter that falsely and fraudulently claimed that "the Court has a longstanding practice of providing the Justices an opportunity to establish a home office, with Court-provided technology equipment (i.e. computers) and furniture to suit their respective needs."

In violation of Title 18, United States Code, Section 1343.

### Count Twenty-Two
### (Obstruction of Justice)

79.     Paragraphs 1 – 66 are incorporated by reference here.

80.     Beginning on or about December 4, 2017, and continuing through on or about May 24, 2018, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II knowingly and corruptly endeavored to influence, obstruct, and impede the due administration of justice, that is, a pending federal grand jury investigation into improper use of Supreme Court funds and property, including determining whether any federal criminal laws had been committed in connection with defendant LOUGHRY's keeping state-owned property—a leather couch and a Cass Gilbert desk—in his home for over four years.

81.     During the time defendant ALLEN H. LOUGHRY II committed the offense, he was well aware of the existence of the pending federal grand jury investigation.

82.     Defendant ALLEN H. LOUGHRY II knowingly and corruptly endeavored to influence, obstruct, and impede the federal grand jury investigation in the following ways, among others:

- Deflecting attention away from his own misconduct and blaming others for improperly using Supreme Court funds and property.

- Creating a false narrative about when the Cass Gilbert desk was moved to his home and under whose direction.

- Using invoices not related to the transport of the leather couch and Cass Gilbert desk to his home in 2013 to buttress the false narrative he had planted.

- Repeating the false narrative to a Special Agent of the FBI in an interview on March 2, 2018.

29

- Relating the false narrative to potential grand jury witnesses, one of whom eventually did testify before the grand jury on May 24, 2018, and who repeated the false narrative.

In violation of Title 18, United States Code, Section 1503.

## Count Twenty-Three
### (False Statement About Using Supreme Court Vehicle)

83.     Paragraphs 1 – 66 are incorporated by reference here.

84.     On or about March 2, 2018, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency within the executive branch of the United States, in that defendant LOUGHRY, in response to a question by a Special Agent of the FBI, stated as follows:

Question:     Have you ever used a state vehicle for any purpose other than business use?

LOUGHRY:     **For personal use, no**. Now, I have taken a vehicle, say for example, because I want to be – I don't want to come back and say well, you know, clarify this. So let's say I've had multiple meetings in Tucker County for various reasons. My parents live in Tucker County, so I have gone there, spent the night there, not charged the state for a hotel or anything like that, and returned.

85.     The statement was false, as defendant ALLEN H. LOUGHRY II then and there well knew, in that he had on several occasions, as outlined above in paragraphs 24 - 28 of this Indictment, used a "state vehicle," that is, one of the Supreme Court's vehicles, for personal use, including occasions when he drove one of the Supreme Court's vehicles to Tucker County, West Virginia, where his parents lived, for reasons unconnected to any meeting or business of the Supreme Court in Tucker County.

In violation of Title 18, United States Code, Section 1001(a)(2).

### Count Twenty-Four
### (False Statement About Cass Gilbert Desk)

86.    Paragraphs 1 – 66 are incorporated by reference here.

87.    On or about March 2, 2018, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency within the executive branch of the United States, in that the defendant, having been asked, "How did it – after that conversation with Canterbury, what took place in order for that desk, for that desk, I'll just ask you, did you initiate the desk getting to your house or did Canterbury initiate the desk," stated to a Special Agent of the FBI:

LOUGHRY:    No, Mr. Canterbury did, and there are receipts from that – it was – **it's my recollection that it went to my home on December 21st of 2012 while I was still a law clerk at the Court. I had no individual authority to direct anybody to do anything like that.** So, the invoice – so there are invoices reflecting this – so the Court paid for and sent a desk to my home. This desk was, you know, it keeps being referred to as the Cass Gilbert desk, and all this, I'm still not certain about all of that and the history and everything around the desk, because I've heard various things. **But this was the desk I was using for approximately ten years as a law clerk.** So my office was on the 4th Floor of the Capitol, and when I won, I would be moving to the third floor of the Capitol and the Chambers. And somebody else was moving into my office and they would bring all of their own furniture and their other things, so I was asked by Mr. Canterbury if I wanted a home office, it was explained in great detail this is available to all Justices, it happened all over the country, I agreed, the Court sent a desk to my home.

88.    The statement was false, as defendant ALLEN H. LOUGHRY II then and there well knew, in that the Cass Gilbert desk that was moved to his home was not the desk he used as a law clerk, but was the Cass Gilbert desk in the chambers he inherited as a Justice of the Supreme

Court, and the movement of the desk to his home occurred on June 20, 2013 at his insistence, not in December 2012 under someone else's direction and authority.

In violation of Title 18, United States Code, Section 1001(a)(2).

## Count Twenty-Five
### (False Statement About Cass Gilbert Desk)

89.     Paragraphs 1 – 66 are incorporated by reference here.

90.     On or about March 2, 2018, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant ALLEN H. LOUGHRY II did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency within the executive branch of the United States, in that the defendant, in response to questions posed to him, made statements to a Special Agent of the FBI, as follows:

Question:    A couple things. Are you aware of a search being undertaken within the Court to find one of the original Cass Gilbert desks for Justice Walker's Chambers?

LOUGHRY:    A search being conducted at the Court. No, I don't recall any search being conducted for a Cass Gilbert desk.

Question:    So you didn't know any of the Court staff was trying to find a desk you had at your house?

LOUGHRY:    No, the Court sent that desk to my house.

Question:    Uh –

LOUGHRY:    But I will – I recall a conversation where I mentioned that there was another desk, and it was in one of my law clerk's offices – but no. I mean the Court – the Court sent that desk to my house.

Question:    But you don't remember any instance where Justice Walker was looking for one of these specific desks, the Cass Gilbert desk, and they couldn't find it. Do you remember anything like that? They could not find one of those desks? For her?

LOUGHRY:    One of the desks is – at all times, the one desk, apparently, is missing, or something. And I think I've heard where it may be now. But there was never – I never hid the fact that a desk was at my house, if that's what you're asking?

Question:    **Did you one, know that was a Cass Gilbert desk?**

34

LOUGHRY:   **No, not at – and I don't think it is a Cass Gilbert desk.**

Question:   I understand. **At what point did you learn that it was claimed that that was a Cass Gilbert desk?**

LOUGHRY:   **Um, in the newspaper.**

Question:   **Recently?  In the last six, seven months?**

LOUGHRY:   **Yes.**

Question:   When it was moved to your house when you were using it as a law clerk or in your home office, **you did not know that it was – that anybody had claimed it was a Cass Gilbert desk?**

LOUGHRY:   **No, it was a desk.**

91.    The statement concerning his knowledge of the type of desk was false, as defendant ALLEN H. LOUGHRY II then and there well knew, in that he was well aware that when the Cass Gilbert desk was moved to his home and throughout the time he kept the Cass Gilbert desk in his home for more than four years, he knew it was a Cass Gilbert desk or a desk described as a Cass Gilbert desk, with historical significance and value.

In violation of Title 18, United States Code, Section 1001(a)(2).

MICHAEL B. STUART
United States Attorney

By:                         

PHILIP H. WRIGHT
Assistant United States Attorney