UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.     CRIMINAL NO. 2:18-cr-00134

ALLEN H. LOUGHRY II

### UNITED STATES' RESPONSE TO DEFENDANT'S SECOND MOTION FOR A NEW TRIAL BASED ON INSUFFICIENT EVIDENCE

#### Introduction

On November 6, 2018, defendant Allen H. Loughry II filed a "Second Motion for New Trial" (ECF No. 96) under Fed. R. Crim. P. 33, which allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Defendant Loughry's motion also seeks relief under Fed. R. Crim. P. 29, which allows a defendant to renew a prior motion for judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Defendant Loughry's newest motion only applies to the guilty verdicts on nine of the eleven counts of conviction – Counts 3, 5, 6, 10, 11, 12, 15, 18, and 20. He does not challenge his convictions on Counts 23 and 25 for making false statements in violation of 18 U.S.C. § 1001.

This Court should deny defendant Loughry's motion. On Count 3, the mail fraud charge involving the Pound Civil Justice Institute, he overlooks direct evidence about the mailing. He also misses key evidence about the false pretense underlying his convictions for wire fraud in Counts 5, 6, 10, 11, 12, 15, and 18. On Count 20, the witness tampering charge, defendant Loughry essentially resorts to making another closing argument while paying scant attention to the mandate

that all reasonable inferences from the evidence should be drawn in favor of the United States (and, therefore, the jury's verdicts on the counts of conviction).

**Applicable Law**

For purposes of a post-trial Rule 29 motion, *all* of the evidence must be viewed in the light most favorable to the United States, to determine if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *See, e.g.*, *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982); *United States v. Bailey*, 819 F.3d 92, 95 (4th Cir. 2016). Circumstantial evidence must be considered as well as direct evidence, and the United States must be afforded the benefit of all reasonable inferences from the evidence. *Tresvant*, 677 F.2d at 1021.[1]

As to how much evidence is enough to withstand a Rule 29 motion for judgment of acquittal, the Fourth Circuit has noted that even the uncorroborated testimony of a single witness may be sufficient. *See, e.g.*, *United States v. Wilson*, 115 F.3d 1185, 1189-90 (4th Cir. 1997); *United States v. Arrington*, 719 F.2d 701, 704-05 (4th Cir. 1983). The credibility of witnesses, moreover, is *not* to be considered. To the contrary, credibility – or the lack of credibility – of witnesses is strictly a matter for the jury, *United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989), and it must be assumed the jury resolved all contradictions in favor of the prosecution. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998), *abrogated on other grounds by Neder v. United States*, 527 U.S. 1 (1999). Accordingly, the Court must sustain the jury's verdict if there is substantial evidence to support it, and "substantial evidence is evidence that a reasonable finder

---

[1] In ruling on defendant Loughry's post-trial motion for a judgment of acquittal under Rule 29, the Court should consider *all* of the evidence introduced at trial, including his testimony. "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).

of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996).

The evidence, moreover, should be considered not in "piecemeal fashion, but . . . in cumulative context." *Id.* at 863 (*citing Kyles v. Whitley*, 115 S. Ct. 1555 (1995)). "We must not rend the garment of which the evidence is woven lest we analyze each individual fiber in isolation." *Burgos*, 94 F.3d at 863. In the final analysis, cases where a court may reverse a jury's verdict due to insufficient evidence should be "confined to cases where the prosecution's failure is clear." *Id.* at 862 (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)). Consequently, the defendant who argues for a judgment of acquittal due to insufficient evidence must overcome a heavy burden. *See*, *e.g.*, *United States v. McLean,* 715 F.3d 129, 137 (4th Cir. 2013).

In deciding a Rule 33 motion for new trial, the district court has broader discretion to review the evidence and weigh the credibility of witnesses. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). The court, however, should exercise its discretion sparingly; it should grant a motion for new trial based on the sufficiency of the evidence only when "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Id.* at 1485.

Moreover, a district court's broader power to evaluate witness credibility under Rule 33 does not authorize it to grant a new trial merely because it disbelieves part or all of the testimony of a government witness. Witness credibility is essentially a jury function. Accordingly, a district court may not override a jury's credibility determination except in extraordinary circumstances, as where the witness's testimony is patently incredible or it violates physical laws. *See*, *e.g.*, *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (reversing grant of new trial based on district court's conclusion that government witnesses were incredible); *United States v. Kuzniar*, 881 F.2d 466, 470-471 (7th Cir. 1989) (same); s*ee also United States v. Martinez*, 763 F.2d 1297, 1313

3

(11th Cir. 1985) (mere conflict in testimony between government and defense witnesses would not entitle defendant to a new trial). In addition, a district court should not grant a new trial under Rule 33 simply because it disagrees with the jury's verdict. *See Arrington*, 757 F.2d at 1486; *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997); *Harper v. United States*, 296 F.2d 612, 614 (9th Cir. 1961).

**Analysis**

A. *Count 3 – Mail Fraud Involving the Pound Civil Justice Institute.*

Defendant Loughry attacks his conviction for mail fraud in Count 3 by arguing that the trial testimony about the mailing of a check from the Pound Civil Justice Institute to him in the summer of 2014 "only indicated that it was the normal practice of the Pound Institute to use the U.S. Mail to deliver reimbursement checks, but there was not testimony or evidence that was, in fact, what happened." Loughry Second New Trial Motion, ECF No. 96, pp.1-2.

Defendant Loughry, however, overlooks an important part of the testimony of Mary Collishaw, the executive director of the Pound Institute in Washington, D.C., as well as Government Exhibit 30. Ms. Collishaw testified as follows:

Q: Please take a look at Government's Exhibit 30.

A: Yes.

Q: Do you have it in front of you?

A: Yes.

Q: Do you recognize it?

A: I do.

> Q: What is it?
>
> A: It is a Pound Civil Justice Institute check made payable to Allen Loughry in the amount of $488.60, dated August 29th of 2014, and it's signed by me, with "2014 Judges Forum Travel Expense Reimbursement" in the memo line.
>
> Q: And was this sent to the defendant?
>
> A: Yes, it was.
>
> Q: How was it sent?
>
> A: Regular U.S. Postage.

Transcript of Collishaw Testimony p.14 (Exhibit A). (The admission into evidence of Government's Exhibit 30 occurred later in her testimony. *See* Exhibit A, p.17.)

Ms. Collishaw did not state that it was the normal practice of the Pound Institute to mail reimbursement checks. Rather, she stated clearly and without hesitation or equivocation that the check for $488.60, that is Government's Exhibit 30, was sent via "Regular U.S. Postage." Her testimony is direct evidence that the Pound Institute mailed the check. *See, e.g., United States v. Allen*, No. 2:07-cr-132, 2009 WL 2424451, at *4 (N.D. Ind. Aug. 6, 2009) (holding that witness's statement that an exhibit "was mailed out" was direct evidence that the U.S. mails were used; "one need only believe that statement without drawing any additional inferences") (*citing Sylvester v. SOS Children's Vills, Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006)).

The evidence at trial also established that the check was delivered to defendant Loughry in the Southern District of West Virginia, as charged in the indictment. The bank records that make up Government Exhibit 6 show that he endorsed the check (Gov. Exhibit 6, ECF No. 75-7, p.53) and deposited it into his account on September 3, 2014 – five days after August 29, 2014, the date on the check. *See id.* p.51 (deposit slip) and p.40 (bank statement). Those dates also support Ms. Collishaw's direct testimony, by creating a reasonable inference that the Pound Institute mailed

5

the check on or about August 29, 2014, with a few days passing, pending delivery by the Postal Service, before defendant Loughry received the check, endorsed it, and then deposited it in his bank account on September 3, 2014.

Finally, it should be noted that even had the evidence about the mailing for Count 3 rested on the "normal practice" of the Pound Institute for sending reimbursement checks, that too would have been sufficient to sustain defendant Loughry's conviction. *See*, *e.g., United States v. Delfino*, 510 F.3d 468 (4th Cir. 2007). In *Delfino*, the Fourth Circuit affirmed a mail fraud conviction on basis of testimony that the victim loan company's usual practice was to send a commercial carrier return envelope to loan applicants. Thus the jury was entitled to conclude that the Delfinos returned their fraudulent loan application via interstate commercial carrier. *Id.* at 471-72; *see also United States v. Hannigan*, 27 F.3d 890, 892-93 (3d Cir. 1994) ("Once evidence concerning office custom of mailing is presented, the prosecution need not affirmatively disprove every conceivable alternative theory as to how the specific correspondence was delivered.").

The evidence was clear and direct. The Court should deny defendant Loughry's post-trial attempt to upset the guilty verdict on Count 3.

B. *Counts 5, 6, 10, 11, 12, 15, and 18 – Wire Fraud Involving Use of Supreme Court Vehicles and Fuel Cards.*

Defendant Loughry challenges his convictions on counts 5, 6, 10, 11, 12, 15 and 18 by arguing that there was no evidence of materially false or fraudulent pretenses or representations. He bases his argument on the lack of evidence about the West Virginia Supreme Court of Appeals having any official travel policy concerning the use of state vehicles by the Justices – "that the Justices were not required to ask for permission to use a state vehicle, and that the Justices were not required to provide a purpose for using the vehicle to any member of the Supreme Court staff." Loughry Second New Trial Motion, ECF No. 96, p.2.

An examination of the nature of charges in the wire fraud counts and the evidence supporting those counts reveals the failings in defendant Loughry's argument. The indictment charged him with fraudulently using a government fuel card to purchase gasoline for personal use. *See* Second Superseding Indictment` ¶ 72. The indictment also charged him with driving a Supreme Court vehicle and using a government fuel card for personal use, while acting "under the false pretense that he would and did use [a Supreme Court] vehicle for official business." *Id.* ¶ 26. The indictment did not charge defendant Loughry with a crime for violating an official travel policy, much less any policy that would have required him to "ask for permission to use a state vehicle" or "provide a purpose for using the vehicle to any member of the Supreme Court staff." Loughry Second New Trial Motion, ECF No. 96, p.2. The existence or non-existence of a policy addressing these issues – permission to use a vehicle and stating a purpose for using a vehicle – is, quite simply, irrelevant. The real issue is this: was there evidence that defendant Loughry used a government fuel card under the false pretense that he was using the Supreme Court vehicle for official business? Most decidedly there was, as explained below.

First, as to the existence of a pretense, defendant Loughry made this definitive statement to the other Justices in August 2016: "I unhesitatingly assure each of you that on the dates mentioned in Justice Davis' various memoranda to Mr. Canterbury, I was acting in my capacity as a Justice of this Court in utilizing a Court vehicle." Gov. Exhibit 69, p.1. Not long after, in a conversation with then-Justice Brent Benjamin, defendant Loughry claimed that he had never used a Supreme Court vehicle for anything but official business. Later, defendant Loughry said something similar in the interview conducted by FBI Special Agent James Lafferty on March 2, 2018. When asked if had ever used a state vehicle for any purpose other than business use, defendant Loughry responded, "For personal use, no." Gov. Exhibit 19 (recording of interview).

7

In addition, in his own testimony at trial, defendant Loughry stated definitively that he never used a state vehicle for personal use, that whenever he used one of the Supreme Court's vehicles he always had a business purpose. Transcript of Loughry Testimony, pp.24-25, 62 (Exhibit B).

These statements were, of course, not true (as noted below), but they also had significance beyond the fact that each was false. They served as clear evidence from which the jury could have reasonably reached this conclusion: during the times he drove a Supreme Court vehicle and used the assigned fuel card, defendant Loughry had acknowledged and at least outwardly accepted the idea that he could not and should not use a Supreme Court vehicle and government fuel card for personal use. Indeed, even in his own trial testimony and closing argument, defendant Loughry never claimed or even attempted to defend himself by arguing he could have used a Supreme Court vehicle and its fuel card however he wanted, even for personal use, because of the lack of any official travel policy. He had accepted the supposition that he should only drive a Supreme Court vehicle and use the accompanying government fuel card while on official business, and his claims at trial that he always did so represent admissions of the existence of the pretense at the time of the crimes.

Second, the evidence at trial established beyond a reasonable doubt that the supposition, *i.e.,* the pretense, was false. The United States introduced defendant Loughry's personal calendars (collectively introduced as Gov. Exhibit 71), which showed no business entries that would have justified or explained his use of the government fuel cards on the dates and times charged in the wire fraud counts of conviction. The United States introduced records from the Supreme Court's vehicle reservation records (Gov. Exhibit 50), which showed defendant Loughry's having a vehicle reserved for his use during the times at issue in the counts of conviction. The United States introduced E-ZPass® transponder records (Gov. Exhibit 5), and his personal credit card records

8

(Gov. Exhibit 7). The chart introduced as Government Exhibit 102 succinctly summarized all of the aforementioned records. The United States also introduced records showing location data for his cellular telephone (Gov. Exhibit 100), through the testimony of FBI Special Agent Kevin Horan. All of these records established that defendant Loughry did in fact drive a Supreme Court vehicle and use the assigned fuel card on the dates and times in question. And he conceded as much, as he put on no alibi defense.

The evidence also established the utter lack of any official purpose related to the gas purchases charged in the counts of conviction. For example, the evidence on Count 5 included the following:

- Loughry purchased 18.360 gallons of gasoline for the Supreme Court's Buick LaCrosse in Morgantown, West Virginia, at 3:05 p.m. on November 28, 2013. Gov. Exhibit 3, p.69 (Fuel Record); Gov. Exhibit 50, p.10 (S. Ct. Vehicle Reservation Log).

- The fuel capacity for the Buick LaCrosse was 19.5 gallons. Gov. Exhibit 51E, p.2 (Owner's Manual excerpt).

- His last call on his cell phone in the Morgantown area on Nov. 28, 2013, occurred at 3:09 p.m. Gov. Exhibit 100, p.12.

- He purchased 5.744 gallons of unleaded gasoline in Elkview, West Virginia, at 5:08 p.m. Gov. Exhibit 3, p.69.

- The Elkview exit is about nine miles from the intersection of Interstate 77 and 79 on the north side of Charleston. Testimony of Investigator Jim Powers.

- His first call on his cell phone in the Charleston area on Nov. 28, 2013, occurred at 5:15 p.m. Gov. Exhibit 100, p.12.

- He purchased an additional 11.206 gallons of unleaded plus gasoline at 8:31 p.m. on Nov. 28, 2013, in Charleston, West Virginia, the purchase charged in Count 5. Gov. Exhibit 3, p.69.[2]

---

[2] Row C on the Chart that is Gov. Exhibit 102, on p.1, summarizes much of this evidence.

- November 28, 2013, was Thanksgiving Day. Gov. Exhibit 71 (*see* Calendar for 2013). The Supreme Court was closed on holidays. Testimony of Gundy, Angus.

The evidence for Count 10, which charged a purchase of 13.550 gallons of unleaded plus gasoline at 8:17 p.m. on Sunday, January 19, 2014, in the midst of the Martin Luther King Holiday weekend, was similar. *See, e.g.*, Chart, Gov. Exhibit 102, p.3 (Row I information); Cell Site Location Data, Gov. Exhibit 100, p.22 (January 17 through January 19, 2014).

In sum, as to Counts 5 and 10, the evidence was substantial. It included in particular the times of the gas purchases charged in Counts 5 and 10 (late in the evening); the dates (Thanksgiving Holiday and Sunday on a Holiday weekend); the type of gas purchased (unleaded plus); the fact that defendant Loughry had purchased gas for the Supreme Court's vehicle near Charleston not long before the gas purchases charged in Counts 5 and 10; and the lack of any calendar entries indicating any business purpose. Based on this evidence alone the jury could have reasonably concluded that the pretense – that defendant Loughry used a Supreme Court vehicle and government fuel card for official business – was indeed false.

The evidence on Counts, 6, 11, 12, 15, and 18 – all of which dealt with defendant Loughry's using a Supreme Court vehicle to drive to The Greenbrier Resort for book-signing events – also was substantial. The book-signing events were for *his* book, which he authored in 2006, years before he became a Justice. *See* Testimony of Shelly Weikle (Greenbrier employee), Melinda Pennington (McClain Printing employee), Gov. Exhibit 16 (Loughry's book). The Greenbrier purchased multiple copies of the book from him, but paid his wife, at his request. Gov. Exhibit 8, pp.4-9 (Greenbrier records). His trial testimony that he was not paid for the book-signing events, Transcript of Loughry (Exhibit B, pp.38, 76), was proven utterly false by his own email of April 23, 2015 (Gov. Exhibit 113). In that email, Loughry asked about the late payment of "my little

bill" for "approximately $293.00," because "I did a book signing in early March at The Greenbrier and sold some books (*Don't Buy Another Vote, I Won't Pay For A Landslide*) to The Shoppe in early March or late February." Gov. Exhibit 113. Thus, his own writing established that the sales of his books to The Greenbrier, and the subsequent payments, were undoubtedly tied to the book-signing events.[3] Moreover, the fact that The Greenbrier paid his wife substantiated the personal nature of the trips and refuted the notion that the book-signing events were somehow related to defendant Loughry's work as a Justice of the Supreme Court. Finally, the fact that he wanted The Greenbrier to pay his wife, and then he failed to disclose the 2014 payments, which exceeded $1200, on his 2014 Judicial Financial Disclosure form, Gov. Exhibit 9, were facts from which the jury could have reasonably concluded that he was acting deceitfully and trying to hide something – the fraud he was committing by using a Supreme Court vehicle and a government fuel card for personal reasons.

Other evidence supported this conclusion. The testimony of Arthur Angus and Jess Gundy about defendant Loughry's refusing to supply a destination when asked where he was going, and his anger at the fact that Officers Angus and Gundy disclosed to the other Justices his refusal to provide a destination when asked, were evidence of his deceitful and fraudulent intent. The jury could have reasonably concluded that Loughry's refusal (and anger) served as evidence that he was hiding the fact that he used the Supreme Court's vehicles and fuel cards for personal use.

The jury also was entitled to consider defendant Loughry's false statements to the other Justices about his vehicle usage – the memorandum that is Government Exhibit 69 and his statement to then-Justice Benjamin, denying he ever used a Supreme Court vehicle for anything

---

[3] It also bears noting that the checks from The Greenbrier, made payable to Loughry's wife, were deposited in their *joint* account. *See* Gov. Exhibit 6, pp.19-28 (bank records).

but official business – as evidence of his guilt on the wire fraud counts. *See*, *e.g., United States v. Calhoun*, 49 F.3d 231, 236 (6th Cir. 1995) (noting that a factfinder could construe a defendant's attempts to disassociate himself from incriminating evidence by telling lies or providing false information as evidence of guilt). The false statements, moreover, were false representations in furtherance of the wire fraud scheme. That they were made after the crimes charged in the counts of conviction occurred is of no moment. *See, e.g., United States v. Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996) ("[B]oth this court and the Supreme Court have recognized that actions taken to avoid detection, or to lull the fraud victim into complacency, can further the fraud, even after the victim as ceded funds or goods to the perpetrator's control."); *United States v. Pierce*, 409 F.3d 228, 232-33 (4th Cir. 2005) (for purposes of the mail fraud statute, mailings occurring after receipt of the fraudulently-obtained goods may be considered if they are designed to lull or placate the victim and keep the fraud going).

      Finally, defendant Loughry's trial testimony supplied evidence of his guilt. He claimed not to have used a Supreme Court vehicle for personal use. Exhibit B, pp.24-25, 62. He claimed not to have been paid by The Greenbrier. *Id.* at 38, 76. The jury obviously did not believe him with respect to the counts of conviction for wire fraud. His lack of credibility at trial "can be rationally viewed as further circumstantial evidence indicating guilt." *See Burgos*, 94 F.3d at 867 (holding that *Burgos's* contradicted testimony and conflicting responses undermined his credibility and were circumstantial evidence of his guilt); *see also Wright v. West*, 505 U.S. 277, 296, 112 S. Ct. 2482, 2492 (1992) (holding that the jury was entitled to disbelieve defendant West's testimony, and if it did, it was further entitled "to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"); *United States v. Bennett*, 848 F.2d 1134, 1139 (11th Cir. 1988) ("a

defendant's implausible explanation may constitute positive evidence in support of a jury verdict"). Thus, his lack of credibility at trial supports the jury's guilty verdicts.

    *C. Count 20 – Tampering With a Witness, Kim Ellis.*

Lastly, defendant Loughry attacks his conviction on Count 20, the witness tampering charge involving Kim Ellis. His argument on this count, however, neglects evidence about his engaging in misleading conduct toward Ms. Ellis, while knowing that she would potentially be a witness in an ensuing federal grand jury investigation.

The evidence at trial included the following:

- On October 18, 2017, the news media asked the Supreme Court about the costs related to defendant Loughry's office renovations. Kim Ellis Transcript of Trial Testimony, p.23 (Exhibit C).

- Ms. Ellis had worked on the renovations of defendant Loughry's office and had the file related to that work. Exhibit C, p.23.

- The very next day, October 19, 2017, Ms. Ellis was summoned to her boss's office, Gary Johnson, to meet with Johnson; Sue Racer-Troy; two lawyers, Chris Morris and Lori Paletta-Davis, who were administrative counsel; and defendant Loughry. Exhibit C, pp.26-27.

- At the meeting, defendant Loughry made a declarative statement to Ms. Ellis: "[B]ut I was very specific over and over and over, that whatever we spend on anything, I don't want mine to be more than Menis [former Justice Ketchum] or Margaret's [Chief Justice Workman]." Gov. Exhibit 98 (Recording); *see also* Gov. Exhibit 98A, p.2 (transcript, but which was not admitted into evidence but used as an aid to the jury during the playing of the recording).

- Defendant Loughry followed up his declaration with a question, "Do you recall those conversations?" Ms. Ellis responded that she did not. Gov. Exhibit 98 and 98A, p.2.

- In fact, that which Loughry declared had happened had never happened at all. He never told Ms. Ellis to hold down the spending on his office to a level at or below the amounts spent on the offices of Justice Ketchum and Justice Workman. Exhibit C, p.32.

13

- Ms. Ellis said she did not remember the conversations only because she was being polite. Exhibit C, p.32.

- Later in the meeting in Gary Johnson's office on October 19, 2017, defendant Loughry said "I swear I thought you had papers that showed the expenditures in Davis – not Davis, in Menis and Margaret's offices." Gov. Exhibit 98 (recording); Gov. Exhibit 98A, p.4 (transcript).

- In fact, however, Ms. Ellis had no papers or files about the renovations of the offices of Justice Ketchum and Justice Workman, Exhibit C, pp.32-33. Indeed, she had never worked on the renovations of their offices. *Id.*

- Sue Racer Troy also testified that Ms. Ellis would not have had information about how much had been spent on Ketchum's and Workman's offices. Testimony of Racer-Troy (Exhibit D), p.52.

- Ms. Ellis recorded her participation in the meeting in Gary Johnson's office on October 19, 2017, because she was scared. Exhibit C, p.25.

- She was scared because of prior dealings with defendant Loughry. In January 2017, defendant Loughry called Ms. Ellis in the evening, when she was at her son's soccer practice, and said he wanted to keep their conversation "off the record," that he had fired her boss, Steve Canterbury, that day, that he understood Ms. Ellis to be loyal to Mr. Canterbury and/or to be "a spy" for him, but that Ms. Ellis had "nothing to worry about," because "we like you." Exhibit C, pp.25-26.

- In that same conversation in January 2017, defendant Loughry also directed Ms. Ellis personally to scrape Mr. Canterbury's name off his door, even though one of her subordinates would be at work early in the morning and could do the scraping. Exhibit C, p.26.

- Defendant Loughry contacted then-United States Attorney Carol Casto on October 20, 2018, to report wrongdoing connected with outrageous spending at the Supreme Court, including spending on renovations of his office. Testimony of Carol Casto.

- Defendant Loughry had previously called the U.S. Attorney's Office to report what he believed to be possible federal crimes in connection by employees at the Supreme Court. Testimony of Carol Casto; Loughry Testimony, Exhibit B, p.79.

- Defendant Loughry met with FBI Special Agent Lafferty in November 2017, to discuss more fully the report he previously made to U.S. Attorney Casto. Testimony of FBI SA Lafferty.

- After the meeting on October 19, 2017, Ms. Ellis was moved from her office to another office between the offices of the two administrative counsel, Chris Morris and Lori Paletta-Davis, who had attended the October 19 meeting, sitting on either side of defendant Loughry. Exhibit C, p.33.

The jury had the opportunity to evaluate the credibility of Sue Racer-Troy and Kim Ellis. Ms. Racer-Troy corroborated Ms. Ellis on the fact that Ellis would not have possessed records or other information about how much had been spent on renovating the offices of Justices Ketchum and Workman. So, in that respect, Ms. Racer-Troy provided additional evidence of the falsity of defendant Loughry's declaration to Ms. Ellis – that he supposedly told her "over and over" to limit the spending on his office.

The jury also had the benefit of the evidence on the fraud counts, including the testimony of Brent Benjamin, Jess Gundy, and Arthur Angus. The jury evaluated their words, demeanor, and ultimately, their credibility, and weighed their credibility against the credibility of the defendant, who, in his testimony, went so far as to accuse Benjamin of lying on the witness stand. That accusation fit a pattern – that defendant Loughry would retaliate against those who questioned or criticized him by accusing *them* of engaging in possible criminal activity. He did that very thing in 2016, by calling the United States Attorney's Office about spending by Robin Davis, who had questioned defendant Loughry's travel. He made another accusation in October 2017 by calling United States Attorney Casto about the outrageous spending at the Supreme Court and blaming Steve Canterbury, after it became apparent that Mr. Canterbury had discussed the spending with the news media. And he did it again in February 2018, when he called Special Agent Lafferty to report possible wrongdoing by Justice Workman in connection with the preparation of a will.

From all of the foregoing evidence, including the fraud evidence, the jury could have reasonably concluded not only that Kim Ellis was credible, but that defendant Loughry was not credible, that he was vindictive and vengeful when crossed, and that he would not hesitate to flex his power and authority to get what he wanted. Accordingly, the jury could have reasonably inferred and concluded the following:

- Defendant Loughry was aware of the media inquiry about the spending for his office, and that he wanted to get out in front of what would eventually be a torrent of negative publicity by blaming others, specifically Steve Canterbury, for the outrageous spending.

- That in reporting what he believed to be wrongdoing by Mr. Canterbury to the United States Attorney, defendant Loughry had reason to believe that a federal grand jury investigation would ensue.

- With respect to the soon-to-be-initiated grand jury investigation, defendant Loughry had reason to believe that (i) the expenditures for the renovations of his office would be a subject of the investigation, and (ii) that Kim Ellis would be a witness in the investigation because she had worked on and possessed the file for the renovations of his office.

- Defendant Loughry lied when he stated to Ms. Ellis that he had repeatedly said to her ("over and over and over") that "whatever we spend on anything," he did not want the spending on his office to be more than the amounts spent on the renovations of the offices of Justices Ketchum and Workman. Defendant Loughry thus engaged in "misleading conduct" toward Ms. Ellis.[4]

- Defendant Loughry's lie to Kim Ellis was self-serving and was designed to avoid blame for the outrageous spending.

- Defendant Loughry intended to intimidate Ms. Ellis when (i) he called her after work in January 2017 to tell her that although she was loyal to Steve Canterbury ("a spy"), she had nothing to worry about, because "we like you;" and (ii) he directed Ms. Ellis personally, and not one of her subordinate employees, to scrape the name of Mr. Canterbury off the door.

---

[4] The definition of misleading conduct includes "knowingly making a false statement," 18 U.S.C. § 1515(a)(3)(A), and the jury was so instructed.

16

- Defendant Loughry was quite willing to engage in criminal activity himself by committing fraud and then by covering it up by lying to the FBI.

- By attempting to have Ms. Ellis falsely remember something that had not happened (supposedly telling her to limit the spending on his office), defendant Loughry acted with the intent to influence the testimony of Ms. Ellis in the soon-to-be-initiated federal grand jury investigation.

This summation of what the jury could have reasonably inferred and concluded from the evidence covers each of the elements for the crime of witness tampering, 18 U.S.C. § 1512(b)(1), the crime charged in Count 20. Those elements, as given to the jury, were:

One: The defendant engaged in misleading conduct toward another person, or corruptly persuaded or attempted to corruptly persuade another person;

Two: In doing so, the defendant acted knowingly; and

Three: The defendant acted with the intent to influence or prevent the testimony of that person in an official proceeding.

Defendant Loughry nevertheless argues that if he had really intended to influence Ms. Ellis, he would have done so in private. Loughry Second Trial Motion, ECF. No. 96, p.5. But the test is not whether some explanation other than guilt might explain the defendant's conduct. The test is not whether one agrees with the jury's verdict. *See Arrington*, 757 F.2d at 1486. Rather, the test for a post-trial Rule 29 motion is whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt, without weighing the credibility of any witness and considering all reasonable inferences in favor of the government. *See, e.g., Tresvant,* 677 F.2d at 1021. And the evidence and all reasonable inferences from that evidence provided a more-than-sufficient basis for the jury in this case to find defendant Loughry guilty on Count 20.

To be sure, the Court has broader discretion under Rule 33. Nevertheless, it must be remembered that defendant Loughry testified at trial. He specifically denied having any motive or intent to influence Ms. Ellis's testimony. Exhibit B, p.58. Not only did the jurors hear his words, but they also observed his demeanor, his body language, and his manner of testifying, and they weighed his testimony against the other evidence. Quite apparently, the jury did not believe him. So again, as noted above on p.12, his lack of credibility at trial "can be rationally viewed as further circumstantial evidence indicating guilt." *See Burgos*, 94 F.3d at 867 (holding that *Burgos's* contradicted testimony and conflicting responses undermined his credibility and were circumstantial evidence of his guilt). Indeed, the testimony of defendant Loughry, as unbelievable as it was, entitled the jury to conclude that his perjured testimony was "affirmative evidence of guilt." *Wright v. West*, 505 U.S. at 296, 112 S. Ct. at 2492.

The Court should grant a new trial only when "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d. at 1485. Defendant Loughry simply cannot meet his heavy burden under Rule 33 to establish that "the interest of justice so requires" a new trial.

## Conclusion

For the reasons explained above, the Court should deny defendant Loughry's Second Motion for New Trial (and for judgments of acquittal). The evidence introduced at trial was more than sufficient to sustain the jury's guilty verdicts, which came after careful and measured deliberation. The fact that there were several counts on which the jury acquitted the defendant

demonstrates that the jury listened to the testimony, considered the evidence and thoughtfully applied the law to that evidence as instructed. This Court should uphold the guilty verdicts.

                                  Respectfully submitted,

                                  MICHAEL B. STUART
                                United States Attorney

By:

                                s/Philip H. Wright
                                PHILIP H. WRIGHT
                                Assistant United States Attorney
                                WV State Bar No. 7106
                                300 Virginia Street, East
                                Charleston, WV 25301
                                Telephone: 304-345-2200
                                Fax: 304-347-5104
                                E-mail: philip.wright@usdoj.gov

                                s/R. Gregory McVey
                                R. GREGORY McVEY
                                Assistant United States Attorney
                                WV State Bar No. 2511
                                300 Virginia Street, East
                                Room 4000
                                Charleston, WV 25301
                                Telephone: 304-345-2200
                                Fax: 304-347-5104
                                E-mail: greg.mcvey@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing "UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 16th day of November, 2018, to:

>John A. Carr
>John A. Carr Attorney at Law, PLLC
>179 Summers Street, Suite 209
>Charleston, WV  25301

By:
>s/Philip H. Wright
>PHILIP H. WRIGHT
>Assistant United States Attorney
>WV State Bar No. 7106
>300 Virginia Street, East
>Charleston, WV  25301
>Telephone:  304-345-2200
>Fax:  304-347-5104
>E-mail:  philip.wright@usdoj.gov