UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA,

v.                                      Case No. 2:18-cr-00134

ALLEN H. LOUGHRY, II,

MEMORANDUM OPINION AND ORDER

        Pending is the defendant's second motion for a new
trial, filed November 6, 2018, by defendant Allen H. Loughry,
II, seeking a judgment of acquittal, or in the alternative, to
vacate the convictions and grant a new trial. The government
filed a response on November 16, 2018, to which the defendant
did not reply.

I.   Background

        On October 12, 2018, after a six-day trial and two
days of deliberation, a jury rendered a verdict finding the
defendant, Allen H. Loughry, II, guilty of eleven counts of the
second superseding indictment, consisting of one count of mail
fraud (Count 3), seven counts of wire fraud (Counts 5, 6, 10,
11, 12, 15, and 18), one count of witness tampering (Count 20),
and two counts of making false statements (Counts 23 and 25).

He was found not guilty on ten counts and the jury was unable to reach a verdict on Count 8.

The defendant filed this motion seeking a judgment of acquittal pursuant to Fed. R. Crim. P. 29, or, in the alternative, to vacate the convictions and grant a new trial, pursuant to Fed. R. Crim. P. 33.  The defendant challenges his convictions for mail fraud, wire fraud, and witness tampering; he does not address his convictions for making false statements.

## II.   Legal Standard

Rule 29 states that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The court may, as here, reserve the decision on the motion until after the jury returns a verdict of guilty, and thereafter "decide the motion on the basis of the evidence at the time the ruling was reserved."  Id.

A judgment of acquittal under Rule 29 is "a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003) (quoting Smalis v. Pennsylvania, 476 U.S. 140, 144

(1986)).  "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt."  United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir.1982).  The defendant bears a heavy burden, and "reversal for insufficiency must 'be confined to cases where the prosecution's failure is clear[.]'"  United States v. Edlind, 887 F.3d 166, 172 (4th Cir.), cert. denied, 139 S. Ct. 203 (2018) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)).  The court does not "weigh the evidence or assess the credibility of witnesses, but assume[s] that the jury resolved any discrepancies in favor of the government."  United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007) (citing United States v. Romer, 148 F.3d 359, 364 (4th Cir.1998)).

Under Rule 33, the court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  "A trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it."  United States v. Burfoot, 899 F.3d 326, 340 (4th Cir. 2018) (quoting United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003)).

### III.   Discussion

The court addresses the motions as to the three categories of convictions — mail fraud, wire fraud, and witness tampering — separately.

### a. Mail Fraud

The defendant challenges his conviction on Count 3 for mail fraud in violation of 18 U.S.C. § 1341.

The defendant was convicted of mail fraud in connection with an event conducted by the Pound Civil Justice Institute in July 2014.  Specifically, the defendant, then a Justice of the Supreme Court of Appeals of West Virginia, requested, and received, reimbursement in the form of a check for his travel expenses to the Pound Institute event in Baltimore, Maryland, despite having had no such expenses because he had used a state-owned vehicle assigned to the Supreme Court of Appeals of West Virginia and had used a state government credit card to purchase gasoline.

18 U.S.C. § 1341 states, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository

4

> for mail matter, any matter or thing whatever to be
> sent or delivered by the Postal Service, . . . or
> knowingly causes to be delivered by mail . . .
> according to the direction thereon, or at the place at
> which it is directed to be delivered by the person to
> whom it is addressed, any such matter or thing . . .

shall be guilty of an offense against the United States.

The defendant's sole ground for contesting this conviction is that the testimony at trial did not support the conclusion that he "used or caused the use of the U.S. mail" to defraud the Pound Institute.  Defendant's Motion, ECF # 96 at 1. In making this contention, the defendant overlooks an important portion of the testimony at trial.  Mary Collishaw, the executive director of the Pound Institute, testified at trial that the check sent to then-Justice Loughry on August 29, 2014, for $488.60 (government's Exhibit 30), to reimburse him for travel expenses, was sent by regular U.S. postage:

> Q.   [W]as [the Pound Civil Justice Institute check
> made payable to Allen Loughry] sent to the defendant?
>
> A.   Yes, it was.
>
> Q.   How was it sent?
>
> A.   Regular U.S. Postage.

Transcript of Proceedings, Testimony of Mary Collishaw, ECF # 70 at 14.  Additional testimony about the Pound Institute's regular practice of using the U.S. mail, including Ms. Collishaw's testimony that attendees would "complete their reimbursement

request and return it to [the Pound Institute] via mail with
their receipts[,]" id. at 10, only serves as further evidence
that the defendant used the Postal Service in defrauding the
Pound Institute.  Accordingly, the court finds that the jury
reasonably could have found the defendant guilty beyond a
reasonable doubt of mail fraud.

### b. Wire Fraud

The defendant challenges his convictions for wire
fraud under 18 U.S.C. § 1343.

The defendant was found by the jury to be guilty of
the seven wire fraud offenses charged in Counts 5, 6, 10, 11,
12, 15 and 18.  Each count stems from the defendant's purchase
of gasoline with a State of West Virginia credit card in order
to fuel a road journey that he took for personal rather than
official purposes.

18 U.S.C. § 1343 states, in pertinent part:

> Whoever, having devised or intending to devise any
> scheme or artifice to defraud, or for obtaining money
> or property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to
> be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any
> writings, signs, signals, pictures, or sounds for the
> purpose of executing such scheme or artifice, . . .

shall be guilty of an offense against the United States.

Five of these seven counts (6, 11, 12, 15 and 18) relate to a total of four trips from Charleston to the Greenbrier Hotel Resort in White Sulphur Springs, West Virginia. The defendant, a resident of Charleston, is the author of a 2006 book on public corruption in West Virginia, entitled "Don't Buy Another Vote, I Won't Pay for a Landslide." While at the Greenbrier on these four trips, the defendant appeared on a Saturday at a shop located in the Hotel, out of which copies of the book were sold, in order that he could personally sign the book or answer questions about it if requested by a purchaser. The shop set out, on public display, an ad announcing the sale and his presence. The proceeds of the sales, except for the shop's share, were deposited in a joint bank account maintained by the defendant and his wife.

Those four trips to the Greenbrier took place over a fifteen-month period that included the Saturdays of December 14, 2013 (Count 6), March 22, 2014 (related to Counts 11 and 12), December 20, 2014 (Count 15) and March 14, 2015 (Count 18). On his personal calendar there is noted "Greenbrier Book Signing" on each of those four Saturdays, accompanied by the figures "1:00-3:00" or "1-3" except for March 22, 2014, which was marked "11:00 a.m."

The transponder in the vehicle he used for these four trips provided EZ Pass through the two I-64 West Virginia toll booths at Pax and Chelyan for travel from Charleston to White Sulphur Springs.  On two of those four trips (December 14, 2013 and March 14, 2015), the vehicle was recorded as having passed through those two booths while proceeding south and again while returning north.  The other two (March 22, 2014 and December 20, 2014) record passage through the two booths only while proceeding south because the return trip was routed next to Parsons, in Tucker County, where the parents of the defendant reside.

Of the two remaining trips, Count 5 occurred on Thanksgiving Day, November 28, 2013, at the end of travel from Charleston to Morgantown (156 miles north of Charleston) and return to Charleston.  The other, Count 10, took place during the period of Saturday, January 18 to Sunday, January 19 at the end of round trip travel from Charleston to Parsons (156 miles northeast of Charleston) and return to Charleston.

All of these six trips occurred at a time when the defendant requisitioned, from the West Virginia Supreme Court car pool, a 2012 Buick La Crosse for a period of week-end days (other than the one on Thanksgiving) that covered the dates of travel noted above except that he checked out a 2009 Buick

8

Lucerne for the Counts 10 and 15 travel that took him to Parsons.  In every such instance, the defendant gave no destination for his travel.  In every such instance gas was purchased with the state credit card normally assigned to the vehicle he requisitioned.

In connection with five of the seven counts (Counts 5, 10, 12, 15 and 18), the state credit card was used to purchase gas, inter alia, in Charleston before departure on December 20, 2014 (Count 15) and otherwise in Charleston upon return.  As the defendant acknowledged in his trial testimony, "a lot of times, the Sunday evening is just filling up the vehicle and returning it on Sunday evening."  Transcript of Proceedings, Testimony of Allen H. Loughry, II, ECF # 102 at 96-97.

Of the remaining two counts, on the December 14, 2013, Greenbrier trip (Count 6), gas was purchased at Beckley, a near half-way point along I-64, on the return route to Charleston. In the March 23, 2014, trip, which started with a March 22 trip to the Greenbrier, with an extension to Parsons, gas was purchased near Charleston (Count 11) on March 23 at Amma (28 miles northeast of Charleston), being a point on the I-79 portion of the return route from Parsons to Charleston.

On each of those seven occasions, the defendant's cell phone number, (304) 546-6316, was detected, by virtue of incoming or outgoing calls or by texting or by "data sessions"[1] consisting of such internet usage as e-mail or Instagram or Facebook updates, to be in communication with nearby cell towers located in the vicinity of places en route to or visited by the defendant; and on all but two of those occasions, being the two same-day trips to and from the Greenbrier (Counts 6 and 18), his personal credit card was used to make food and similar purchases at relevant points:

Count 5     November 28, 2013 (Thanksgiving Day)

            Gas purchased at Sheetz in Morgantown 3:05 p.m.
            Cell phone contact in Morgantown 3:09 p.m.
            Gas purchased at Exxon in Charleston 8:31 p.m.
            On the preceding day, November 27, cell phone
                contact in Charleston at 2:32 p.m. and in
                Morgantown at 4:57 p.m., and defendant's
                personal credit card was used at a Taco Bell
                in Morgantown

Count 6     December 14, 2013 (Saturday) (Calendared for the
                Greenbrier 1:00 to 3:00 p.m.)

            Cell phone contact at White Sulphur Springs at
                3:59 p.m.
            Gas purchased at Beckley 4:57 p.m.

---

[1] The government's expert, Kevin Horan, an FBI Agent with the Cellular Analysis Survey Team, testified that data sessions are less reliable but do reflect the general geographic area of a cell phone.

Count 10    January 19, 2014 (Sunday)

           Cell phone contact at Parsons at 3:09 p.m.
               (also on January 18 at 11:14 a.m.)
           Gas purchased at Charleston at 8:17 p.m.
           On the preceding day, January 18, defendant's
               personal credit card was used at a Burger
               King in Weston, which is at the junction of
               I-79 and U.S. Route 33 that leads to Parsons
               by connecting with U.S. Route 219 at Elkins.

Counts 11
  and 12    March 23, 2014 (Sunday) (Calendared for the
               Greenbrier at 11:00 a.m. on March 22)

           On March 22, cell phone contact at White Sulphur
               Springs at 12:41 p.m. and 2:02 p.m.
           On March 22, defendant's personal credit card
               was used at VIRTU at White Sulphur Springs
           On March 22, cell phone contact at Parsons at
               7:07 p.m. and 7:59 p.m.
           On March 23, defendant's personal credit card
               was used at Shop-n-Save at Parsons
           On March 23, gas purchased at Amma (28 miles
               northeast of Charleston on I-79 that
               connects at Weston to U.S. Route 33 to
               Parsons) at 6:03 p.m. (Count 11)
           On March 23, cell phone contact at Charleston
               at 7:24 p.m.
           On March 23, gas purchased at Charleston at
               8:58 p.m. (Count 12)
           The transponder in the La Crosse provided
               EZ Pass for the two I-64 West Virginia
               Turnpike toll booths at Pax and Chelyan
               going south on March 22 but none returning
               north, indicating travel directly from
               Lewisburg (ten miles from White Sulphur
               Springs) to Parsons by U.S. Route 219

Count 15    December 20, 2014 (Saturday) (Calendared at the
            Greenbrier 1:00 to 3:00 p.m. and "To
            Parsons overnight")

            Gas purchased at Charleston at 10:41 a.m.
            Cell phone contact at Lewisburg consisting
                of five data sessions from 12:08 to
                12:10 p.m.
            Cell phone contact at White Sulphur Springs
                consisting of eight data sessions from
                12:49 to 4:15 p.m.
            The transponder in the Lucerne provided
                EZ Pass for the two I-64 West Virginia
                Turnpike toll booths at Pax and Chelyan
                going south but none returning north,
                indicating travel directly from
                Lewisburg to Parsons by U.S. Route 219,
                passing through Elkins 20 miles south of
                Parsons
            On December 20, defendant's personal credit card
                was used at Kroger in Elkins

Count 18    March 14, 2015 (Saturday) (Calendared for
            Greenbrier 1:00 to 3:00 p.m.)

            Cell phone contact at White Sulphur Springs
                consisting of ten data sessions from 2:24 to
                3:25 p.m.
            Cell phone contact at Lewisburg at 3:32 through
                3:40 p.m.
            Gas purchased at Charleston at 5:11 p.m.


        All State of West Virginia credit card charges are,

when the charge is made, electronically transmitted to Aurora,

Colorado, where the account is maintained by WEX which pays the

merchant and then bills the State for reimbursement that the

State then pays, all of which occurred in this case.

There is more than ample evidence to support the
jury's verdict of guilty on each of Counts 5, 6, 10, 11, 12, 15
and 18.  Indeed, the consistency with which the defendant
engaged in these unlawful acts over a 15-month period
establishes a pattern and practice of fraudulent conduct that
enabled him to convert to his own use, by false pretenses,
assets of the State of West Virginia.

There defendant nonetheless argues that the evidence at
trial failed to establish any false or fraudulent pretense
because it did not establish the existence of a travel policy by
the West Virginia Supreme Court of Appeals.  The defendant
essentially argues that because "the Justices were not required
to ask for permission to use a state vehicle [or] to provide a
purpose for using the vehicle to any member of the Supreme Court
staff[,] . . . it is simply not possible as a legal or factual
matter for any use of the vehicle or purchase of gasoline to
constitute [wire fraud.]"  Defendant's Motion, ECF # 96 at 2.

Under the wire fraud statute, "the element 'to
defraud' has 'the common understanding of wronging one in his
property rights by dishonest methods or schemes and usually
signify[ing] the deprivation of something of value by trick,
deceit, chicane, or overreaching.'"  United States v. Wynn, 684
F.3d 473, 477-78 (4th Cir. 2012) (citations omitted).  The lack

13

of any official West Virginia Supreme Court of Appeals policy regarding the use of state vehicles is irrelevant.  Regardless of the existence of a policy so stating, charging one's employer for personal expenses wrongs the employer of its property rights and, quite simply, constitutes theft.  The jury could have easily found that when the defendant used the state credit cards for fuel as charged in the seven wire fraud counts, he knew he was acting under the false pretense that he was conducting official business.  Any reasonable person would know that he can only charge his employer for expenses occurred while acting in his employment capacity.  The lack of any official policy monitoring a Justice's use of state vehicles or the purchase of gasoline could not reasonably be construed in the manner proffered by the defendant, who contends that lack of a policy constitutes permission for the Justice to engage in such personal use of the state's credit cards to fuel a state vehicle as the Justice may desire.

        Indeed, the defendant seems to have persisted in this postulation through his repeated attempts to convince others that he only used state vehicles for business purposes.  See, e.g., Gov. Exhibit 69 (Loughry's 2016 memorandum to the other Justices: "I unhesitatingly assure each of you that on the dates mentioned in Justice Davis' memoranda to Mr. Canterbury, I was

acting in my capacity as a Justice of this Court in utilizing a Court vehicle."); Gov. Exhibit 19 (recording of the defendant's interview with FBI Special Agent James Lafferty, indicating that he never used a state vehicle for a personal purpose.); and the defendant's trial testimony:

> Q.   Have you ever used a state vehicle for personal use?
>
> A.   No. . . .
>
> Q.   Did you, though, ever use the [state] vehicle for personal use?
>
> A.   No.

Transcript of Proceedings, Testimony of Allen H. Loughry, II, ECF # 101 at 24-25.  In light of the abundant evidence contradicting these statements, the jury could have reasonably determined them to be false.

Accordingly, the court finds that the jury reasonably could have found the defendant guilty beyond a reasonable doubt of the wire fraud offenses charged in Counts 5, 6, 10, 11, 12, 15 and 18.

### c. Witness Tampering

Finally, the defendant challenges his conviction on Count 20 for witness tampering in violation of 18 U.S.C. § 1512(b)(1).

The factual basis for this conviction arises from incidents occurring primarily in October 2017 with a witness and Supreme Court of Appeals of West Virginia employee, Kim Ellis. On October 18, 2017, Kennie Bass, a reporter for WCHS-TV, contacted Jennifer Bundy, the Public Information Officer at the Supreme Court of Appeals of West Virginia, asking about costs related to then-Justice Loughry's office renovations.  No official investigation had yet begun, and no news-media story had yet been published.  Ms. Bundy contacted employees who may have had that information, but she was unable to locate records as to the office renovations expenditures.  Accordingly, in an effort to procure that information and determine how best to respond to Kennie Bass, a meeting was held the next day, October 19, 2017.  As stated at trial by Sue Racer-Troy, Chief Financial Officer of the Supreme Court of Appeals of West Virginia:

> Kennie Bass had requested some information
> specifically on Justice Loughry's chambers, the
> renovation costs there.  And he also requested
> specifically the amount of the renovations, and was it
> true that Justice Loughry's renovations had cost twice
> as much as any other office, which we couldn't respond
> to right away. That was going to take some work.

16

So that's why we were in kind of a strategy meeting of
how are we going to put this information together. How
long will this take, that sort of thing, is what we
were talking about.

Transcript of Proceedings, Testimony of Sue Racer-Troy, ECF #

104 at 51.  The defendant testified to this point as well:

Q.   What was the purpose of the meeting?

A.   T[he meeting] was October 19th.

     And on October 18th, while I was on the bench, we
     were hearing cases, apparently there was a news
     reporter who called Jennifer Bundy, our public
     information person, our press person, and said he
     had some questions with regard to offices and
     some expenditures.

Q.   And so what was the purpose of the meeting?

A.   And I guess Jennifer went to the others first,
     and they wanted information that we didn't have.
     So I was called -- so we had this meeting. And we
     were trying to figure out how to get this
     information. There weren't records.

Testimony of Proceedings, Testimony of Allen H, Loughry, II, ECF

# 101 at 55.  The following people were present at the meeting

which was held in the office of Gary Johnson, the Administrative

director at the time: Gary Johnson, who was also Kim Ellis'

boss; Ms. Racer-Troy; Chris Morris and Lori Paletta-Davis,

attorneys and administrative counsel for the court; and then-

Chief Justice Loughry.  During the course of the meeting,

Loughry asked that Ms. Ellis join the meeting because she had

worked on the renovations of his office and had the file related
to that work.

Ms. Ellis recorded the approximately thirty-minute
portion of the meeting for which she was present, because she
was scared that she was being called in to be fired.  <u>See</u>
Transcript of Proceedings, Testimony of Kim Ellis, ECF # 99 at
57, (on cross-examination:

> Q.   And you said that you recorded that because, in
>      effect, you were scared that you might be getting
>      ready to get fired?
>
> A.   Yes.).

She had this fear because of previous interactions with then-
Chief Justice Loughry, most notably in January 2017, when
Loughry called Ms. Ellis in the evening, asked her to keep their
conversation "off the record[,]" and informed her that her boss,
Steve Canterbury, had been fired, but that even though she was
"loyal and/or a spy for Steve Canterbury," she had "nothing to
worry about [because w]e like you."  <u>Id.</u> at 26.   He also asked
her to personally remove Mr. Canterbury's name from his door the
next morning, even though she informed Loughry that a
maintenance engineer would be in earlier than her and could do
it.  <u>Id.</u>  She removed the name.  <u>Id.</u>

18

An excerpt of Ms. Ellis' recording of the meeting was
played for the jury at trial and admitted into evidence.  See
Gov. Exhibits 98 and 98A.  The primary basis for the witness
tampering charge relates to a statement from the defendant
during this meeting:  "Well, when we did my office . . . and I
don't know, you can tell me if you remember this or not, but I
was very specific over and over and over, that whatever we spend
on anything, I don't want mine to be more than Menis [Justice
Ketchum] or  Margaret's [Chief Justice Workman.]  Do you recall
those conversations?"  Gov. Exhibit 98A at 2.  Ms. Ellis
responded that she did not recall those conversations.  Later in
the conversation, the defendant said: "Kim, when we talked about
this back then and we sat in my[]office, I swear I thought you
had papers that showed the expenditures in . . . Menis and
Margaret's offices."  Id. at 4.  She responded: "I don't re-- if
I did, they'd be [in those] files.  [I kept] everything in
there."  Id.  At trial, Ms. Ellis testified that the
conversation that the defendant asked her about did not happen,
and that she did not have any of the information regarding the
other Justice's office renovations.  Ms. Racer-Troy further
testified that Ms. Ellis could not have had that information
because she did not have access to the state's financial
records.  Testimony of Racer-Troy at 53.  It took Ms. Racer-Troy

19

three weeks to assemble the information requested by Kennie
Bass.  Id. at 54-55.

On October 20, 2017, the day following the meeting,
the defendant called United States Attorney Carol Casto, who
served in that position for two years from January 2016 to
January 2018 and had been an Assistant United States Attorney
for the preceding eighteen years.  The defendant reported to her
a "considerable number of concerns" including "ridiculous
spending[.]"  Transcript of Proceedings, Testimony of Allen H.
Loughry, II, ECF # 102 at 79.  This was the second time the
defendant had contacted the United States Attorney's Office
concerning spending at the West Virginia Supreme Court of
Appeals; the first occurred around August 2016 when the
defendant spoke with Assistant United States Attorney Steve Ruby
regarding the cost of a party held at the home of then-Justice
Robin Davis.  Id. at 77-78.  No evidence was presented regarding
the outcome of that conversation, and Ms. Casto, when she
testified at trial, indicated no awareness of it prior to
October 20th when the defendant raised the grievance again
during his phone call that day to her.

In that call, the defendant advised Ms. Casto that he
joined the court in 2013 when there were a number of renovation
projects ongoing at the court, and that, as Chief Justice, he

had gained access to financial information that identified "millions and millions in ridiculous spending." The defendant's primary concerns were related to "excessive spending on the remodeling/renovation projects," but he also expressed concern about the party at the Davis home and spending on an electronic court system that included electronic oversight for all the state courts in West Virginia. The defendant asked United States Attorney Carol Casto to look into it. She told him she would refer it for investigation. Ms. Casto testified that she then asked the Chief of the Criminal Division, Assistant United States Attorney Steve Loew, to look into the matter raised by then-Chief Justice Loughry and engage the necessary federal law enforcement agency.

Steve Loew then contacted FBI Special Agent Jim Lafferty advising him of the allegations made by then-Chief Justice Loughry and asking him to contact Loughry to schedule a meeting. Agent Lafferty did so, and a meeting was held November 20, 2017, between Agent Lafferty, Steve Loew, then-Chief Justice Loughry, Justice Margaret Workman, Chris Morris, Sue Racer-Troy, and Gary Johnson, during which the allegations of improper spending were discussed. Following the meeting, Agent Lafferty began an investigation and in early December, the first federal grand jury subpoena for records was issued to the Supreme Court

of Appeals of West Virginia.  Agent Lafferty testified at trial
that it was during the course of this investigation that the FBI
became concerned about Loughry's own use of state funds,
primarily in reference to state vehicles, and the FBI expanded
their investigation.  On February 13, 2018, a second federal
grand jury subpoena was issued to the Supreme Court seeking
records specifically related to the defendant.  Loughry did not
learn of this second subpoena until February 15, 2018, when he
called Agent Lafferty to make another report concerning alleged
misconduct by Justice Workman in connection with a will.  A
federal grand jury investigation as to the defendant ensued, and
an indictment was filed on June 19, 2018.  Aside from the
witness tampering charge, no federal charges were brought
against him related in any way to the office renovations.

       18 U.S.C. § 1512(b)(1) makes it a crime to
"knowingly[] . . . corruptly persuade[] another person, or
attempt[] to do so, or engage[] in misleading conduct toward
another person, with intent to . . . influence, delay, or
prevent the testimony of any person in an official
proceeding[.]"  Corrupt persuasion "does not require 'acts,
threats, emotional appeals, or persistent pleading,' but does
require the Government to prove 'a defendant's action was done
voluntarily and intentionally to bring about false or misleading

testimony ... with the hope or expectation of some benefit to the defendant[.']" United States v. Edlind, 887 F.3d 166, 174 (4th Cir. 2018), cert. denied, 139 S. Ct. 203 (2018) (quoting United States v. Sparks, 791 F.3d 1188, 1191-92 (10th Cir. 2015)).  Misleading conduct includes "knowingly making a false statement[.]"  18 U.S.C. § 1515(a)(3).  For purposes of the statute, "an official proceeding need not be pending or about to be instituted at the time of the offense[,]" 18 U.S.C. § 1512(f)(1), but the proceeding must at least be foreseen, and the defendant must have contemplation of a particular official proceeding in which the statement attributed to the defendant is material.  Arthur Andersen LLP v. United States, 544 U.S. 696, 707–08 (2005).

In 2005, the Supreme Court of the United States decided Arthur Andersen LLP v. United States, wherein the Court clarified what constitutes "corrupt persuasion" and the requisite relationship to an official proceeding.  The defendant in Arthur Andersen was facing a conviction for violating 18 U.S.C. §§ 1512(b)(2)(A) and (B), which makes it a crime to knowingly, corruptly persuade another person with intent to cause that person to withhold documents from or alter documents for use in an official proceeding.  After Enron Corporation's financial difficulties became public and the Wall Street Journal

published an article on August 28, 2001, suggesting impropriety
by Enron, Enron's auditors, Arthur Andersen, explicitly urged
their employees in a meeting on October 10, 2001 to comply with
the firm's document retention policy, and thereby shred old
documents, because "['i]f it's destroyed in the course of [the]
normal policy and litigation is filed the next day, that's
great..... [W]e've followed our own policy, and whatever there
was that might have been of interest to somebody is gone and
irretrievable.'"  Arthur Andersen LLP, 544 U.S. at 700.

At the time of the meeting, Arthur Andersen knew that
an SEC investigation was "highly probable." Id. at 699.  Their
employees were nonetheless repeatedly urged to abide by their
document retention plan, even though they knew "['t]he
marketplace [was] going to keep the pressure on th[em] and [was]
going to force the SEC to be tough.'" Id. at 701.  On October
30, the SEC opened a formal investigation, and on November 8,
they served Enron and Arthur Andersen with subpoenas for
records.  Id. at 702.  Only then, on November 9, were the
employees instructed to cease shredding documents.  Id.

The Supreme Court reversed the court of appeals'
decision affirming Arthur Andersen's conviction because it found
the jury instructions failed to adequately convey the requisite
consciousness of wrongdoing and failed to require any nexus

24

between the act of persuasion and a particular proceeding.  The Court noted: "A 'knowingly ... corrup[t] persaude[r]' cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material."  Id. at 707–08.

In United States v. Edlind, the Fourth Circuit noted: "Prior to, and in light of, Arthur Andersen, lower courts have parsed the phrase 'corrupt persuasion,' searching for its outer limits."  United States v. Edlind, 887 F.3d 166, 173 (4th Cir. 2018), cert. denied, 139 S. Ct. 203 (2018)[2].  In that case, Edlind was convicted of witness tampering under § 1512(b)(1) for her repeated efforts to convince a witness in an upcoming trial, in which her close friend Chujoy was implicated, to refrain from saying anything, and assuring the witness, per Chujoy's instructions, that incriminating statements Chujoy had previously made to the witness were merely jokes.  The district court had noted that "this view of witness tampering is novel,"

---

[2] Although the Fourth Circuit has not directly addressed whether Arthur Andersen applies with full force to § 1512(b)(1), the court's reliance on it in Edlind indicates that it does.  Other circuits have reached this conclusion.  See e.g. United States v. Shavers, 693 F.3d 363, 379 (3d Cir. 2012), cert. granted, judgment vacated on other grounds, 570 U.S. 913, 133 S. Ct. 2877, 186 L. Ed. 2d 902 (2013) (holding that Arthur Andersen applies to § 1512(b)(1)).

but nonetheless found support for the conviction. <u>United States v. Chujoy</u>, 207 F. Supp. 3d 626, 647 (W.D. Va. 2016). The Fourth Circuit affirmed, finding that "corrupt persuasion includes situations where a defendant coaches or reminds witnesses by planting misleading facts." <u>Edlind</u>, 887 F.3d at 174. It found that the evidence was sufficient that Edlind knowingly corruptly persuaded the witness because she made "constant suggestions" that the witness "did not understand when Chujoy was joking or lying[,]" and there was strong circumstantial evidence of corruption. <u>Edlind</u>, 887 F.3d at 174-75.

The circumstantial evidence in <u>Edlind</u> included: that Edlind contacted the witness days after receiving a letter from Chujoy instructing Edlind to correct the witness; that Edlind requested that the witness leave his phone in his car during their conversation for fear it was bugged; and that the conversation occurred merely two weeks before Chujoy's scheduled trial. <u>Id.</u> The court stated: "By confusing [the witness], Edlind sought to undermine his ability to testify persuasively against Chujoy[.] Coupled with the circumstantial evidence implicating Edlind — the timing of events following Chujoy's June 3 letter and Edlind's constant attempts at avoiding governmental surveillance — there is sufficient evidence to support the conviction for witness tampering." <u>Id.</u> at 176.

The court referred to cases from other circuits in reaching this conclusion.  For instance, in United States v. LaShay, the Seventh Circuit Court of Appeals affirmed a conviction for witness tampering.  There, the defendant was facing trial for conspiracy to defraud the United States in connection with his scheme to help Pakistani nationals obtain permanent resident status in the United States by paying United States citizens to marry them.  417 F.3d 715, 716 (7th Cir. 2005).  Three days prior to his trial, he "repeatedly urg[ed]" a witness, who was also his friend and coworker, to "'remember' that he saw [LaShay receive a] $2000 check for petty cash, when [the witness] knew he had not actually seen the check change hands," and the witness told LaShay the first time he mentioned the check to him that "there was no way he could have been present for the event because he and LaShay worked different shifts." Id. at 717-19.  The court noted: "A jury could properly view LaShay's remarks as an unstated invitation to lie. This is true even though the evidence at trial never established that LaShay's account of the check was false; LaShay was suggesting that Clark claim personal knowledge of the transaction when in fact he had none." Id. at 719.

In United States v. Gabriel, the defendant was convicted of witness tampering after he made a false statement

and subsequently sent a fax supporting that false statement.
United States v. Gabriel, 125 F.3d 89 (2d Cir. 1997) overruled
in part on other grounds, United States v. Quattrone, 441 F.3d
153, 176 (2d Cir. 2006).  Specifically, he sent a witness a fax
headed "ONGOING GOVT INVESTIGATION . . . [,]" that contained a
false account of a meeting relevant to the government's
investigation.  Id. at 94.  In the fax, he instructed the
witness to "think this through" before speaking to "attorneys
within the next several days."  Id.  He "knew that there was an
ongoing grand jury investigation at the time he sent the fax and
[] knew that [the recipient of the fax] could be a damaging
witness."  United States v. Gabriel, 125 F.3d 89, 105 (2d Cir.
1997) overruled in part on other grounds, United States v.
Quattrone, 441 F.3d 153, 176 (2d Cir. 2006).

       Lastly, in United States v. Bedoy, the Fifth Circuit
found sufficient evidence to convict Bedoy, a police officer, of
witness tampering in relation to a grand jury investigation
involving his giving sensitive law enforcement information to a
prostitute in exchange for sexual relations.  827 F.3d 495 (5th
Cir. 2016).  After the officer learned that he was being
investigated and that a grand jury had convened, he contacted
the woman with whom he was accused of engaging in misconduct and
instructed her that if she were contacted, she should not say

28

anything and should misrepresent their illicit relationship.
Id. at 501.

Taking guidance from these cases, it is apparent to
the court that the evidence presented here falls short of
sustaining a witness tampering conviction.

First, in each of these cases, the weight of the
alleged persuasion was strong, presented in the form of repeated
statements or direct instructions on how to testify.  In Edlind,
the defendant made "constant suggestions" that the witness did
not understand Chujoy and should alter his testimony.  In
LaShay, the defendant "repeatedly urged" the witness to remember
something, even after the witness told the defendant that he
could not have been there for the event the defendant was
asserting he should remember.  In Gabriel, the defendant made a
false statement, subsequently sent a fax seeking to support that
statement, and instructed the witness to "think this through"
before answering questions.  And in Bedoy, the defendant
expressly instructed the witness how to testify if questioned,
openly inviting her to misrepresent their relationship.

Second, in each of these cases there was a sense of
urgency motivating the defendants' desire to persuade testimony,
which served as evidence of contemplation of a particular
official proceeding.  In Edlind, Chujoy spoke with Edlind about

29

his concerns over the witness' upcoming testimony at trial, and days later, just two weeks before Chujoy's trial, Edlind attempted to convince the witness that Chujoy's incriminating statements to him were jokes.  In LaShay, the repeated "reminders" to the witness about the illicit check occurred just three days before trial.  In Gabriel, the defendant sent the fax to the potentially damaging witness days before he was expected to speak to attorneys and while a grand jury investigation was occurring.  And, lastly, in Bedoy, the police officer was reacting to information he had just received that a grand jury had been convened to investigate his misconduct.

The weight of the alleged persuasion here was, on balance, significantly less than that found in these cases. There was only one conversation, conducted in the presence of others, between then Chief-Justice Loughry and an employee of his court, Ms. Ellis, from which one statement, possibly two, could conceivably be construed as inviting Ms. Ellis to lie. There was no repeated urging, no constant suggestions, and no direct instructions on how to respond to questioning.  Rather, the defendant here said, "I don't know, you can tell me if you remember this or not[.]"  While a conversation such as this could possibly suffice to show corrupt persuasion or misleading conduct between an employer and an employee, the court chooses

30

not to answer that question here because the witness tampering
charge ultimately fails due to insufficient evidence of a nexus
between the conversation and an official proceeding.

The court finds this situation most akin to the
scenario in Arthur Andersen, where, in response to media
scrutiny, the defendant destroyed important documents.  Indeed,
in that case, the alleged misconduct had already been published
by the media and there was evidence that the defendant knew an
SEC investigation would ensue.  Importantly, the Court in Arthur
Andersen emphasized that mere persuasion to destroy documents,
without "contemplation [of] any particular official proceeding
in which those documents might be material[,]" fails to
establish the requisite nexus between the persuasion and a
particular proceeding.  Arthur Andersen LLP, 544 U.S. at 697.
The Court further instructed that it is "one thing to say that a
proceeding 'need not be pending or about to be instituted at the
time of the offense,' and quite another to say a proceeding need
not even be foreseen."  544 U.S. at 707-08, quoting 18 U.S.C. §
1512 (f)(1).

Here, the media had not yet published any story
regarding office renovations and had made no inquiry of which
defendant was shown to be aware until the day before the meeting
with the group that called in Kim Ellis.  The purpose of the

31

meeting, as stated at trial, was not to prepare for a grand jury investigation, or other official proceeding, but was simply to determine how to respond to a media inquiry.  There was no evidence that the conversations during that meeting ever strayed from that purpose.  At most, there is sufficient evidence that the defendant contemplated a media investigation and that he may, or may not, at that very moment have anticipated contacting the next day the United States Attorney, who would decide whether to investigate.[3]  Notably, the defendant could not have known that contacting United States Attorney Carol Casto would necessarily prompt a future official proceeding, particularly in light of the evidence that the defendant had previously contacted Assistant United States Attorney Steve Ruby in August 2016 and no official proceeding resulted from that conversation.

Corrupt persuasion in contemplation of media scrutiny and a conversation with a United States Attorney, however, does

---

[3] It is an open question in the Fourth Circuit as to whether an FBI investigation constitutes an "official proceeding," but the Ninth Circuit has held that it does not: "[I]f we were to read the phrase 'official proceeding' to include an FBI investigation, as the Government urges us to do, this subsection of the statute[, § 1512(f)(1),] would work to criminalize actions taken before an investigation was even 'pending or about to be instituted.' We do not think that the obstruction of justice statute was intended to reach so far back as to cover conduct that occurred even pre-criminal-investigation." United States v. Ermoian, 752 F.3d 1165, 1172 (9th Cir. 2013), as amended (Aug. 28, 2013).

not constitute witness tampering.  Rather, there must be evidence of a particular official proceeding that, while not necessarily pending or about to be instituted, is foreseen by the defendant at the moment the questionable conduct occurs such that there is a nexus between the conduct at the time it took place and the official proceeding.

The evidence here is insufficient to establish that during the October 19, 2017 meeting the defendant foresaw any particular official proceeding at which Ms. Ellis would testify, because at the moment the conduct occurred, the evidence merely proved that Loughry was anticipating a media investigation. Without sufficient evidence of such a nexus, the defendant's requisite intent was not proven, and the elements of witness tampering were not satisfied.

Even construing the evidence in the light most favorable to the government, the government simply failed to provide sufficient evidence that during the October 19, 2017, meeting, the defendant was corruptly persuading or engaging in misleading conduct with the intent to influence Ms. Ellis's testimony in a contemplated official proceeding.

Accordingly, the court finds that it must render a judgment of acquittal pursuant to Rule 29 for Count 20 of the second superseding indictment.

## IV.   Conclusion

Based on the foregoing, the court hereby ORDERS that the defendant's second motion for a new trial which seeks a judgment of acquittal as to the subject counts or, alternatively, a new trial, be, and it hereby is, denied as to Counts 3, 5, 6, 10, 11, 12, 15 and 18, and judgment of acquittal is granted as to Count 20.  The court accordingly ORDERS that the defendant be, and he hereby is, acquitted of Count 20 of the second superseding indictment.

Additionally, pursuant to the jury verdict rendered October 12, 2018, in which the jury unanimously found the defendant Not Guilty on Counts 1, 2, 4, 7, 9, 13, 14, 16, 17 and 21, it is ORDERED that the defendant be, and he hereby is, acquitted of those Counts.  As for Count 8, on which the jury could not agree, the government is ORDERED to notify the court whether it elects to retry the defendant as to that count.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER:   January 11, 2019

John T. Copenhaver, Jr.
Senior United States District Judge