UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA,

v.                                    Case No. 2:18-cr-00134

ALLEN H. LOUGHRY, II,

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is the defendant Allen H. Loughry, II's motion for a new trial, filed under seal October 26, 2018, seeking a new trial pursuant to Rule 33 for the alleged violation of the defendant's Sixth Amendment right to trial by an impartial jury. The focus of the motion is on Juror A, whose anonymity the court strives to preserve.  The defendant supplemented his motion on November 13, 2018, to all of which the government has responded, followed by the defendant's reply and the government's sur-reply.

I.   Factual and Procedural Background

Beginning in October 2017, the Justices of the Supreme Court of Appeals of West Virginia came under media scrutiny for alleged corruption.  The defendant, then-Chief Justice Allen H. Loughry, II, was one of those at the core of this scrutiny, with the allegations against him relating to lavish office

renovations, the taking of a so-called "Cass Gilbert desk" and Supreme Court couch to his home, and the improper use of state vehicles and of state credit cards for the purchase of fuel. Amidst the media investigation, the defendant himself alerted the Office of the United States Attorney to alleged improper spending, attributing the blame to a Supreme Court employee.  A federal investigation into the Supreme Court ensued, and eventually turned its attention to the defendant and Justice Menis E. Ketchum II individually.  Concurrent with the federal and media investigation, the West Virginia Judicial Investigation Commission and the West Virginia House Judiciary Committee were also conducting investigations.

On June 6, 2018, the West Virginia Judicial Investigation Commission filed a 32-count judicial complaint against Loughry, alleging that he violated several parts of the state's Code of Judicial Conduct.  Subsequently, on June 19, 2018, a federal criminal indictment of Loughry was returned by the grand jury.  That was followed by the resignation of Ketchum as of July 27, 2018, and the filing in this court on July 31, 2018, of an Information charging Ketchum with a wire fraud offense for improper use of a state credit card for the purchase of fuel, to which a guilty plea would be filed.  Thereafter, on August 7, 2018, the West Virginia House Judiciary Committee

2

approved articles of impeachment against four sitting justices
on the Supreme Court (then-Justices Loughry, Workman, Davis and
Walker; with Ketchum having already resigned as of July 27th).[1]
Each of these events was highly publicized in the media
throughout West Virginia.

On October 2, 2018, the court conducted jury selection
for the defendant's federal criminal trial.  Due to the pretrial
publicity, a larger than normal venire was drawn, consisting of
approximately seventy potential jurors, split into a morning
group and an afternoon group.  In an effort to remove the taint
of any negative pretrial publicity from the trial, a thorough
voir dire was conducted.  The court questioned the venire, <u>inter</u>
<u>alia</u>, of their knowledge of this case or the impeachment
proceedings, and whether those jurors having such knowledge were
able to set that aside and render a verdict based solely on the
evidence presented in the courtroom.  The parties were permitted
to conduct individual voir dire, at the bench out of the hearing
of the jury panel, of prospective jurors selected by each of
them.  Particularly, the defendant followed up with several
individuals who indicated their awareness of the case and the
impeachment proceedings.

---

[1] The defendant ultimately resigned from the Supreme Court on
November 12, 2018.

Specifically, in the morning session, three prospective jurors stated that they had heard about the case in the news media (prospective jurors J.W., C.C. and R.F.), all three of whom were questioned individually at the bench. Following questioning, prospective juror J.W. was excused by agreement of the parties because he was the primary caretaker for his wife who had a disability; prospective juror C.C. was the subject of a defense challenge for cause that was denied; and prospective juror R.F. was not the subject of a challenge.

The court denied the defendant's for-cause challenge to prospective juror C.C. because, although he indicated during his individual voir dire that he had been following the case "pretty closely" in the media, had discussed it with "friends or family," and had "opinions . . . about the facts and circumstances as [he] underst[ood] them from the news[,]" he was "completely confident" that he could set aside any pretrial knowledge and base a verdict solely upon what would be presented in the courtroom.  Transcript of Voir Dire at 76-81.  The court "with respect to [C.C. was] satisfied that he [could] serve as a fair and impartial juror in the trial of the case."  Id. at 236.

In the afternoon session, eleven jurors stated that they had read or heard about this case in the news media, of which ten stated that they had also heard something about the

impeachment proceedings.  Three additional jurors stated that they had heard about the impeachment proceedings, bringing the total number of those aware of either proceeding to fourteen. Of those ten who stated awareness of both proceedings, two were struck by agreement of the parties without further questioning (P.K. and J.P.), six were brought to the bench for individual voir dire and two were not, with one of the two, juror J.A., being empaneled on the jury.  None of the three who said they had heard only of the impeachment proceedings were called to the bench for individual voir dire, one of whom, Juror A, was empaneled on the jury.

Of those six brought to the bench, the parties agreed to excuse one, prospective juror M.J., after he responded that he could "[p]robably" make a judgment about the guilt or innocence of the defendant based solely on what he sees in the courtroom, but could not affirm with certainty because he held negative feelings towards the United States judicial system as a whole.  Id. at 214-20.  The defendant made a for-cause challenge of prospective juror D.S. that was granted, and the remaining four (B.D., B.H., J.F. and J.W.) were not the subject of for-cause challenges.

The court granted the for-cause challenge of prospective juror D.S. because the court found his responses to the questions posed at the bench "indicative that he is one who comes in with an opinion that in this case [the court] believe[s] is deleterious to the defendant[,]" after he stated that he had "possibly" formed an opinion as to the guilt or innocence of the defendant, but that he "would try to go in with an open mind."  Id. at 208-10, 236.

A jury of twelve with three alternates was empaneled. In summary, of those fifteen, two had stated awareness either of this case or the impeachment proceedings: juror J.A. of the afternoon session stated that the juror had read or heard about this case in the news media and had heard about the impeachment proceedings, id. at 151 and 156; and Juror A of the afternoon session stated that the juror had heard about the impeachment proceedings, id. at 155.

On October 12, 2018, after a six-day trial and two days of deliberation, the jury rendered a verdict finding the defendant, Allen H. Loughry, II, guilty of eleven counts of the second superseding indictment, consisting of one count of mail fraud (Count 3), seven counts of wire fraud (Counts 5, 6, 10, 11, 12, 15, and 18), one count of witness tampering (Count 20), and two counts of making false statements (Counts 23 and 25).

He was found not guilty of ten counts, consisting of nine counts
of wire fraud (Counts 1, 4, 7, 9, 13, 14, 16, 17, and 21) and
one count of mail fraud (Count 2); the jury was unable to reach
a verdict on one count of wire fraud (Count 8). Notably, the
defendant was not federally indicted on any claims relating to
office expenditures, and the jury returned a verdict of not
guilty on the wire fraud claim related to the Cass Gilbert desk
(Count 21), two of the more highly publicized allegations
against the defendant. By order entered January 11, 2019, the
court granted a judgment of acquittal as to Count 20 (witness
tampering) for insufficient evidence.

   a. Juror A

        As indicated in the defendant's motion, on October 23,
2018, the defendant's counsel, John Carr, was approached by an
individual on the street who instructed him to look at the
Twitter account of Juror A. Defense counsel did so and found
what was thought by the defendant to be potentially troublesome
activity from Juror A's Twitter account.

        Twitter is a social media platform whereby people may
publish information to be shared with other members on the
platform. A person with a Twitter account may "follow" other
Twitter accountholders, and conversely, be "followed." On the
Twitter homepage, a Twitter accountholder sees the "tweets" of

7

each of the accounts that the accountholder follows.  A "tweet" is essentially a short statement, occasionally accompanied by photographs or links to news articles, that is shared with a Twitter accountholder's followers, such that it appears on the followers' homepages.  The followers who see this tweet on their homepage may then "retweet" it, whereby it will be posted to the retweeter's twitter profile and be shared with the retweeter's followers on their homepages.  Followers may also "like" a tweet, an action which does not necessarily share the tweet with others but nonetheless makes the tweet visible to the liker's followers.

The defendant brings to the court's attention the following activities from Juror A's Twitter account.[2]

---

[2] The defendant also points to a Facebook post on August 15, 2018, wherein Juror A shared the Facebook page for Judge Will Thompson's Supreme Court campaign and noted that he was a personal friend of Juror A's.  Judge Thompson is a judge on the Twenty-Fifth Judicial Circuit of West Virginia, sitting in Boone County, Juror A's home county.  He was running for the seat vacated by Justice Robin Davis, who had resigned the day after the West Virginia House of Delegates had voted to impeach her as well as Loughry, Workman and Walker; at that time, Justice Loughry had not yet resigned.  Accordingly, this post appears wholly unrelated to the defendant and the facts of this case.  The court therefore disregards it, and only addresses the Twitter posts.  It is noted that Juror A also retweeted two other unrelated matters involving Boone County Schools.

First, on June 7, 2018, Juror A liked and retweeted a tweet from West Virginia House Delegate Mike Pushkin that read:

> 'When the soundness of the judiciary is questioned, coupled with the corrupt activities of the other branches of government, how is the public ever to have any faith in State government?'

Defendant's motion, ECF # 89, Ex. 1 at 15.  Pushkin's statement is a quote, without attribution, from the book authored by the defendant entitled "Don't Buy Another Vote, I Won't Pay for a Landslide: The Sordid and Continuing History of Political Corruption in West Virginia."  See Government's Trial Exhibit 16.  In addition to the quote, the Pushkin tweet and Juror A's retweet thereof contained a photo of the defendant and a link to a Charleston Gazette-Mail news article, written June 6, 2018, entitled "WV Supreme Court Justice Loughry named in 32-count judicial complaint."  ECF # 89, Ex. 1 at 17.  The article details the Judicial Investigation Commission's allegations against then-Justice Loughry, including the cost of his office renovations, his personal possession of the Cass Gilbert desk and other Supreme Court property, and his alleged improper personal use of state-owned vehicles.  Id.

Second, on June 26, 2018, Juror A liked a tweet by West Virginia House Delegate Rodney Miller, which read:

> Legis Special Session begins at noon today looking at Supreme Court impeachments: more state employees quitting/fired: DHHR $1 million overspending for nothing: RISE program dysfunctional until Gen. Hoyer gets involved.  My goodness we've got issues to take care of!

ECF # 89, Ex. 2 at 7.

Third, that same day, Juror A liked another tweet by Mike Pushkin, which read:

> Justice Loughry should resign.  The people of WV already paid for his couch, he should spare them the cost of his impeachment.

Id. at 5.  The tweet contained a link to an opinion article by Ken Hall published June 25, 2018 in the Charleston Gazette-Mail entitled "WV justices who take advantage of public funds should resign."  Id. at 10.  The article mentioned the defendant's suspension from the Supreme Court and the complaint from the Judicial Investigations Commission; it did not mention the federal indictment nor contain any details on the facts surrounding the federal criminal case.

Fourth, on August 7, 2018, the day the Judiciary Committee adopted the articles of impeachment against Loughry and the other Justices, Juror A liked a tweet by James Parker, which read:

> Yes, it is a sad day in WV to think these individuals who are supposed to be the pillars of what is right, just and truthful would become overcome with such an attitude of self importance that they thought the lavish spending was appropriate!

Id. at 5.

Fifth, following the defendant's trial, Juror A tweeted on October 13, 2018:

> Grateful to have had a chance to serve as a juror for a Criminal trial this week.  It was emotionally draining & I'm glad it's Over.  #Juror #ThisisAmerica #Justiceserved #Loughry[3]

ECF #89, Ex. 1 at 11.  On October 14, 2018, Delegate Miller replied to this tweet, stating: "Thank you for your service.  It can be draining at times, but so important."  ECF #89, Ex. 2 at 20.

---

[3] The "#" symbol in a tweet, called a "hashtag," works as a type of tag, categorizing the tweet by the term following the "#" and making it searchable by that term.  Here, for instance, if one were to search for "Loughry" on Twitter, Juror A's tweet could appear in the search results.

Finally[4], the defendant accuses Juror A of accessing
social media throughout the trial.  Specifically, he claims that
Juror A accessed Twitter on October 3 and October 6, Instagram[5]
on October 7, and Facebook on October 8.  Aside from a single
Twitter like by Juror A on October 3, wholly unrelated to this
case, the defendant does not state the source of his knowledge
of Juror A's contact with social media during trial, nor does he
set forth the extent or nature of any such contact.  Indeed,
there is no evidence or allegation that Juror A posted anything
related to the case during that time.  Although Juror A follows
a number of West Virginia elected officials and members of the
media -- including Kennie Bass of WCHS-TV and Brad McElhinny of
West Virginia MetroNews, who reported on the evidence admitted
at trial -- there is no evidence that Juror A was exposed to any
content related to the case.  As will be further fully
developed, the court had instructed the jurors to refrain from
using social media or the internet to obtain information on the
case or communicate with anyone about the case, and Juror A has
not been shown to have violated that admonition.

---

[4] In his supplemental motion, the defendant also states that
"[u]pon information and belief," Juror A contacted the media
hours after rendering a verdict to give a telephone interview to
"WCHS."  The defendant does not state the content of this
interview or the source of his information and belief.
[5] Instagram is another social media platform, intended primarily
for sharing photographs.

The defendant notes that during the four months prior to trial, Juror A liked eleven tweets, four of which related to the defendant or the Supreme Court.  These four consist, as outlined above, of Mike Pushkin's tweet on June 7, Rodney Miller's tweet on June 26, Mike Pushkin's tweet that same day, and James Parker's tweet on August 7; the remaining seven likes during that four-month period prior to trial were wholly unrelated to the case.

During voir dire, Juror A expressed having heard about the impeachment proceedings in the state legislature, but affirmed having the ability to set that aside and listen to the evidence and base a verdict solely upon the evidence received in the courtroom.  Transcript of Voir Dire at 155, 157.

Potentially relevant to this motion, Juror A answered the following questions in the negative:

Question 1: Do any of you have any personal knowledge of the facts of this case?  Id. at 144.

Question 2:  Have you heard this case discussed at any time by anyone in your presence?  Id.

Question 3:  Have any of you read or heard anything about this case in the news media or television or radio?  Id. at 146.

Question 4:  Is there anything further that any of you would want to relate to the Court about your knowledge of this case that goes beyond what we've already covered?  Id. at 157.

Question 5:  Do any of you now have an opinion or have you at any time expressed an opinion as to the guilt or innocence of the defendant of the charge or charges contained in this indictment in this case?  <u>Id.</u> at 158.

Question 6:  Have you heard anything at all from any source about the facts of this case from social networking websites, such as Twitter, Facebook, Instagram, any of you?  <u>Id.</u> at 163.

Question 7:  Are you sensible to any bias or prejudice in this matter or can you think of anything that may prevent you from rendering a fair and impartial verdict based solely upon the evidence and my instructions to you as to the law applicable to that evidence?  <u>Id.</u> at 184-85.

Question 8:  Whether reflecting on all the questions that I've asked you so far, are there any of them to which you would wish to change or supplement your answer that you've already given me?  Have you thought of anything later that you believe you should have told me?  Do any of you have anything further to add?  <u>Id.</u>

Defendant contends that Juror A lied during voir dire by answering these questions in the negative.  Juror A was not questioned individually on voir dire and was placed on the jury.

The defendant now moves for a new trial under Federal Rule of Criminal Procedure 33 for deprivation of his sixth amendment right to trial by an impartial jury.

II.   Discussion

Under Rule 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The Sixth Amendment of the United States Constitution commands juror impartiality in criminal prosecutions.  As stated by the Fourth Circuit:

> The Sixth Amendment . . . affords an accused the right to trial by an impartial jury. As the Supreme Court has observed, a "touchstone of a fair trial is an impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before it.'"

Conaway v. Polk, 453 F.3d 567, 582–83 (4th Cir.2006) (citations omitted).  The defendant raises several theories of juror bias, each discussed in turn.

A.  McDonough Claim

The defendant's primary claim for a new trial is that Juror A was dishonest during voir dire.  In McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984), the Supreme Court set forth a particularized test for determining whether a new trial is warranted in such scenarios.  The Court held:

> to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only

15

> those reasons that affect a juror's impartiality can
> truly be said to affect the fairness of a trial.

McDonough, 464 U.S. at 556.  The Court noted, "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination."  McDonough, 464 U.S. at 555.  Accordingly, "[u]nder th[e McDonough] test, the bar for juror misconduct is set high."  Porter v. Zook, 803 F.3d 694, 697 (4th Cir. 2015).

Under the first prong, the Fourth Circuit has noted that "the [McDonough] test applies equally to deliberate concealment and to innocent non-disclosure[.]"  Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002), see also Porter v. Zook, 898 F.3d 408, 431 (4th Cir. 2018) ("we have viewed the 'honesty' aspect of the first McDonough prong as encompassing not just straight lies, but also failures to disclose.").  Additionally, answers to voir dire questions that are technically true but "misleading, disingenuously technical, or otherwise indicative of an unwillingness to be forthcoming" may suffice.  Billings v. Polk, 441 F.3d 238, 245 (4th Cir. 2006).  However, failing to disclose a fact will not give rise to a McDonough claim if counsel had the opportunity to elicit the information but failed

16

to do so: "McDonough provides for relief only where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask." Billings, 441 F.3d at 245, see also Porter, 803 F.3d at 697 ("a juror's failure to elaborate on a response that is factually correct but less than comprehensive may not meet this standard where no follow-up question is asked.").

As for the second prong, "'[t]he category of challenges for cause is limited,' and traditionally, a challenge for cause is granted only in the case of actual bias or implied bias (although a third category, inferred bias, might also be available)." Jones, 311 F.3d at 312 (citing United States v. Torres, 128 F. 3d 38, 43 (2d Cir. 1997)).

Additionally, "a litigant must show that the fairness of his trial was affected either by the juror's 'motives for concealing [the] information' or the 'reasons that affect [the] juror's impartiality.'" Conaway, 453 F.3d at 585 (quoting McDonough, 464 U.S. at 556).

For the first prong, the defendant contends that Juror A's social media activity prior to trial indicates that Juror A had knowledge of the case and thus should have answered in the affirmative several questions answered in the negative. A close

17

review of that activity and the questions asked, however, demonstrates otherwise.

First, there is no reason to believe that Juror A was anything but truthful in answering questions 2, 3, 4, and 5. Each of these questions asked the jurors about their knowledge of "this case," the facts of which were briefly described to the venire before voir dire. The social media activity of Juror A demonstrates that Juror A had knowledge of the impeachment proceedings and the investigation by the West Virginia Judicial Investigation Commission. Indeed, Juror A admitted as much during voir dire. None of the four tweets or their corresponding articles mention this case nor the federal indictment at all, and they each occurred two to four months before the trial began. The first tweet at issue, and the corresponding article that contains the most detail into the various allegations against Loughry, was retweeted by Juror A before any indictment had been filed. The article noted that "a federal investigation regarding the Supreme Court has been underway at least since December 2017[,]" but it does not state the details of that investigation, or even that Loughry, individually, was a focus of that investigation. Juror A may have had a preconceived notion that Loughry should resign from his seat on the Supreme Court of West Virginia, as indicated by

the juror's "like" of the June 26, 2018 tweet from Mike Pushkin, but that does not indicate any preconceived notion towards his guilt or innocence in <u>this case</u>. Nor do Juror A's answers to these questions suggest an unwillingness to be forthcoming. <u>See</u> <u>Billings</u>, 441 F. 3d at 253. Those answers were not inherently misleading or disingenuously technical; rather, Juror A indicated a willingness to be forthcoming by alerting the court and the parties of Juror A's knowledge of the impeachment proceedings. Accordingly, the defendant fails to meet the first <u>McDonough</u> prong for questions 2, 3, 4, and 5.

Second, as for questions 7 and 8, the court finds no dishonesty. These generic questions were not asked to elicit specific information but were rather meant to allow the prospective jurors the opportunity to volunteer any additional information. At most, Juror A could be said to have failed to volunteer information regarding the extent of Juror A's knowledge of the impeachment proceedings in response to these questions. But a juror's "fail[ure] to volunteer certain information when questioned about her ability to be impartial . . . does not amount to a dishonest response to the questions posed." <u>Billings</u>, 441 F.3d at 244. Juror A's failure to elaborate on the extent of Juror A's knowledge of the impeachment proceedings when asked if one had any additional

19

information to disclose is not a dishonest response, but a simple innocent failure to disclose information that could have been elicited by questions counsel chose not to ask.

Third, questions 1 and 6 differ from the others because they do not simply ask about "this case," but rather ask about "the facts of this case."  The court notes the importance of this distinction because the facts of the federal indictment overlap slightly with the facts contained in the judicial complaint and the articles of impeachment.  Specifically, here, the article retweeted by Juror A on June 7, 2018, contains information about Loughry's possession of a Cass Gilbert desk and his use of state-owned vehicles for personal trips to Tucker County and the Greenbrier.  Assuming Juror A read and remembered the detailed contents of this article, Juror A may have failed to answer fully when responding that Juror A had no personal knowledge of "the facts of this case" and had not heard anything on any social media platform about "the facts of this case."

The court has little difficulty, however, finding that the McDonough claim for those two questions fail on the second prong.

It is doubtful, first, that positive answers to those questions would have warranted a dismissal for cause.  "[I]t is a long-settled proposition that mere knowledge of a case is

20

insufficient to support a finding of actual prejudice." <u>United States v. Higgs</u>, 353 F.3d 281, 309 (4th Cir. 2003).  Many of the potential jurors with pre-existing knowledge of the case remained in the venire.  Indeed, the court denied the defendant's for-cause challenge to prospective juror C.C. because, although he had somewhat extensive knowledge of the case from pretrial publicity, he confidently confirmed that he could remain impartial.  Moreover, the court granted the defendant's for-cause challenge to prospective juror D.S. only after he failed to assure the court that he could set aside his knowledge and decide the case based solely on the evidence presented.  Juror J.A., who stated pretrial knowledge of both the case and the impeachment proceedings, was seated on the jury.

Moreover, the defendant cannot show that the fairness of his trial was affected by Juror A's non-disclosure of such knowledge as Juror A may have had.  The overlapping facts of this case and the facts contained in the pertinent news articles relate to the Cass Gilbert desk and the vehicle usage.  The defendant was acquitted, however, of wire fraud in relation to the Cass Gilbert desk (Count 21) and was acquitted of seven of the wire fraud counts pertaining to his use of state-owned vehicles (Counts 4, 7, 9, 13, 14, 16, and 17) for which he

allegedly made personal use of a state credit card to buy fuel. As for those wire fraud counts pertaining to his use of the state credit card for fuel on which he was convicted, there was ample evidence from which a jury could have convicted him, and the court has affirmed those convictions accordingly.  <u>See</u> Memorandum Opinion and Order, ECF # 119 at 6-15.  Juror A thus apparently set aside any preconceived notions, as Juror A affirmed under oath would be done, and judged the defendant fairly and impartially.

Accordingly, the motion is denied as to the <u>McDonough</u> claim.

B. Actual Bias

Apart from the <u>McDonough</u> claim, the defendant has failed to demonstrate that Juror A was actually biased against him.  A claim of actual bias requires an analysis distinct from a <u>McDonough</u> claim.  <u>Jones</u>, 311 F. 3d at 310 ("The <u>McDonough</u> test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial.").  To succeed on an actual bias claim, the defendant "must prove that a juror, because of his or her partiality or bias, was not 'capable and willing to decide the case solely on the evidence before it.'"

Porter, 898 F.3d at 423 (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).

For many of the same reasons that the McDonough claim fails, so too does this one. As previously noted, it is well settled that mere knowledge of a case is insufficient to support a finding of actual prejudice. See Higgs, 353 F.3d at 309. Further, "the requirement of impartiality does not mean that jurors need to be 'totally ignorant of the facts and issues involved.' Thus, for example, in the context of pretrial publicity, 'the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is [not] sufficient to rebut the presumption of a prospective juror's impartiality.'" United States v. Powell, 850 F.3d 145, 149 (4th Cir.), cert. denied, 138 S. Ct. 142, 199 L. Ed. 2d 188 (2017) (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)).

Even assuming that Juror A was aware of some of the facts and issues involved in the case at the start of trial, and even assuming Juror A had a preconceived notion that the defendant was guilty of something, there is simply no evidence that Juror A was not capable and willing to set that aside and decide the case solely on the evidence presented. Rather, there is evidence that after a thorough deliberation, the jury found the evidence to be insufficient in several instances, and

therefore ruled in the defendant's favor on those counts.  The
defendant points to Juror A's tweet following the trial as
evidence of bias.  A juror's willingness to sit on a jury,
however, and relief when it is finished, is surely not
indicative of any bias against the defendant.

Accordingly, the motion is denied as to the actual
bias claim.

C. Social Media Access During Trial

The defendant also claims that his right to trial by
an impartial jury was violated because Juror A and allegedly
five other jurors, unnamed in the defendant's motion, accessed
their social media accounts on days when the trial was ongoing.
He does not allege that any of the jurors posted anything
related to the case on those days, nor that anyone contacted the
jurors on social media regarding the case.  Rather, the
defendant claims that because Juror A follows certain media
reporters on social media, Juror A could have seen information
related to the case.[6]

---

[6] The court notes the policy concerns with counsel prying into
jurors' personal social media accounts.  As stated recently by
the United States District Court for the Southern District of
New York: "There are also serious policy concerns regarding the
appropriateness of counsel delving into jurors' social media
accounts, after the conclusion of trial, to potentially uncover
juror statements made out of court and unrelated to the

The Supreme Court has noted that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Phillips, 455 U.S. at 217.  Under Remmer v. U.S., 347 U.S. 227 (1954), any outside contact with a juror during trial is presumed prejudicial and resolved at a hearing to determine if such contact was prejudicial.  However, "[t]o be sure, 'due process does not require a new trial every time a juror has been placed in a potentially compromising situation[.]'" Barnes v. Joyner, 751 F.3d 229, 244 (4th Cir. 2014) (quoting Phillips, 455 U.S. at 217).  Rather, "to be entitled to the Remmer presumption and a Remmer hearing, a 'defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict.'" Barnes, 751 F.3d at 244 (quoting Stockton v. Com. of Va., 852 F.2d 740, 743 (4th Cir. 1988)).

Other courts faced with the issue of a juror's social media use during trial have found it not necessarily prejudicial.  See e.g., United States v. Feng Li, 630 F. App'x

---

proceedings, and use any discovered statements as evidence of purported juror bias or inability to be fair. Such a practice may decrease willingness to serve on juries or dampen private citizens' ability to engage in civil discourse." Lewis v. Am. Sugar Ref., Inc., 325 F. Supp. 3d 321, 335, n. 3 (S.D.N.Y. 2018).

29, 33 (2d Cir. 2015) (district court did not abuse its discretion in denying request for new trial after a juror posted on social media regarding "the duration of the trial, courtroom temperature, future creative writing projects, and whether it would be appropriate to speak to certain trial participants about her career as a crime fiction writer when the trial concluded[,]" because the "social media postings did not violate the spirit of the court's social media instruction, which 'was concerned with comments concerning "the facts or circumstances of the case."'") (emphasis in original), and United States v. Fumo, 655 F.3d 288, 306 (3d Cir. 2011), as amended (Sept. 15, 2011) (district court did not abuse its discretion in denying request for new trial when juror posted on Facebook about the trial because the posts were "nothing more than harmless ramblings having no prejudicial effect[,] raised no specific facts dealing with the trial[, and did not] indicate[] any disposition toward anyone involved in the suit.")

        The defendant asserts both in his motion and his briefing that the jurors were admonished by the court not to make any use of social media during the course of the trial. The defendant, who fails to support that assertion with any citation of the record, is incorrect.

Rather, the jury was informed repeatedly that the jurors were not to use social media to learn or discuss anything about "this case," a term which at times was referred to by use of the pronoun "it." Indeed, the jurors were not told that they could make no use of their cell phones, landline telephones, iPhones, or the tools of social media. The following instructions were given, all in the context of this case.

At the close of the first day of trial, on October 2, 2018, once the jury of twelve members and three alternates were chosen, they were instructed as follows:

> I want to mention to you one thing that is so very important at the outset, and that is, of course, as jurors, you must decide this case solely upon the evidence that you hear from the witness stand and the exhibits as they're offered and introduced into evidence in the case.
>
> This means that during the trial, you must not conduct any independent research about this case, the matters in this case, or the individuals involved in this case.
>
> You must not consult dictionaries or reference materials; you must not search the Internet, websites, blogs, or use any other tools, electronic or otherwise, to obtain information about this case or to help you to decide the case.
>
> Do not try to find out information from any source outside the confines of this courtroom.
>
> Until you retire and deliberate, you may not discuss this case with anyone, not even your fellow jurors.

> You may not communicate with anyone about the case, on
> your cell phone, your iPhone, through e-mail, text
> messaging, Twitter, through any blog or website,
> including Facebook, Google, Myspace, LinkedIn,
> YouTube, anything imaginable.  It's all out.  You must
> not use it in any sense.

The next morning on October 3, 2018, just before
opening statements, the jury was asked and it answered as
follows:

> Well, all of you have safely returned.  And my first
> question of you is, whether or not you had any
> difficulty observing the Court's instructions so
> far –
>
> THE JURY:  No, Your Honor.
>
> THE COURT:  -- that you not speak to anyone about this
> case, and avoid all media coverage about it, and you
> not let anyone speak to you about it.
>
> Have you been successful in that regard?
>
> THE JURY:  Yes.

When the jury was excused that evening, the court stated:

> You're going to hear me say this more than once, but,
> continue to be guarded, that is, do not expose
> yourself to any media coverage of any kind; avoid all
> social media, as well, and avoid discussing this or
> letting anyone draw you into discussion about the
> case.

When, at the close of October 4, 2018, the jury was
released for the evening, the jurors were given a similar
instruction.

THE COURT:  Once again, I'll remind you, it's better
for you to have someone else review the newspapers,
and they can filter what you can see.  And you know,
of course, when the newscasts come on television,
because that's pretty well fixed, you need to avoid
that, of course.  And radio is a little different, it
gives the news at any moment, so you have to be very
cautious about that.  And if you happen to have it on
and something is coming on about this case -- and I'm
not sure that that will happen, but it could very well
happen -- then click it off.

And continue to observe the Court's direction that you
not let anyone speak to you about this case nor [are]
you to engage anyone else, and avoid all social
networking with respect to it, as well.

On October 5, 2018, at the point at which the jury was

being excused for the weekend, the jury was instructed in

significant part as follows:

Avoid all social networking having to do with the
case.

The jury returned on Monday, October 8, 2018, at the close of

which the jury was instructed:

It continues to be especially important that you
observe the Court's directive that you avoid all media
coverage about this case, and that, of course, has to
do with radio, television and newspapers, and all
social networking, as well.

So continue to observe those same directions and avoid
all contact.  Don't let anyone contact you about it,
whether it is through social networking or otherwise,
and you, of course, would not be contacting those as
well.

> Let me ask you, once again, have any of you had any
> difficulty observing those directions so far?

> THE JURY:  No.

The presentation of evidence in this case concluded on

October 9, 2018, at which time the jury was excused until the

next morning when closing arguments and instructions to the jury

would begin.  The jury was instructed at that time as follows:

> Avoid all news media and social networking having to
> do with this case.

The jury in due course began its deliberations in late afternoon

on October 10, 2019, by which time Juror A's October 3rd "like"

on an unrelated matter and three other alleged but unspecified

social media contacts during trial would have concluded.  The

jury was instructed as follows just before it was excused for

that evening:

> And I will just say briefly that, as you can
> understand, under no circumstances are you to discuss
> the case with anyone or let anyone discuss it with
> you.  Continue to avoid all news media and social
> networking exposure of any kind until you're back in
> here in the morning in the jury room, at 9:30, with
> deliberations starting only after all 12 of you are
> present.

The jury returned the next day, October 11, 2018, and,

after a day of deliberation, was excused overnight with the

following instruction:

> Well, I gather you've had a hard day's work and you're
> ready to go home and come back in the morning at 9:30.
> And I'm not going to go over all this with you again,
> but I just want to impress upon you, continuing the
> necessity of your seeing to it that no one is in touch
> with you about this case, not even among yourselves
> until all 12 of you are back in the jury room tomorrow
> morning at 9:30.

The jury reached a verdict the next afternoon on Friday, October 12, 2018.

Thus, aside from the fact that there was no request that the court ban the jury from all access to social media, nor any voir dire questions regarding whom the jurors followed on social media, the court's instructions, just as those in Feng Li, were limited to avoiding social media contacts concerning this case. The defendant has not shown that any such unauthorized contact was made. Furthermore, the defendant has not shown that accidental glimpses of a tweet regarding the defendant's trial, if any should ever be shown to exist, would reasonably call into question the integrity of the verdict. The jury was not expected to live in a vacuum during trial but was instructed to avoid all contacts pertaining to the trial so that their verdict would be based solely on the evidence presented and not by any outside influence or contact.

Accordingly, the motion is denied as to this claim.

D. Post-Trial Evidentiary Hearing

The court pauses to address its decision not to conduct an evidentiary hearing. In his reply, the defendant states: "If the Court determines that the record is insufficient, the Defendant further respectfully requests that an evidentiary hearing be held to further develop the record concerning the issues raised by this motion." ECF # 108-1 at 4. Because the request was first raised in the reply, the court directed the government to file a sur-reply addressing the request. See ECF # 109 and 110, filed under seal. It is apparent to the court that the record is sufficient and that no hearing is warranted.

The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Phillips, 455 U.S. at 215. "A court is not, however, 'obliged to hold an evidentiary hearing any time that a defendant alleges juror bias.'" Porter v. Zook, 898 F.3d 408, 426 (4th Cir. 2018) (quoting Billings, 441 F.3d at 245). The Fourth Circuit has not set forth a specific test for determining when a post-trial evidentiary hearing is mandated for allegations of jury impartiality.

In <u>Billings</u>, the Fourth Circuit stated that it does not require courts "to hold a post-trial evidentiary hearing about matters that the defendant could have explored on voir dire but, whether by reason of neglect or strategy, did not." <u>Billings</u>, 441 F. 3d at 245.

Further, in <u>Jones v. Cooper</u>, 311 F. 3d 306, the Fourth Circuit affirmed the district court's denial of a juror bias claim without holding an evidentiary hearing.  There, after a careful review of the questions asked in voir dire and juror questionnaires, the court found it sufficient that "even truthful answers to the questions on the questionnaire could not have formed the basis for a challenge for cause." <u>Jones</u>, 311 F.3d at 313.  The court further noted that although the "[m]isstatements on [the] jury questionnaire" were troubling, they "d[id] not, standing alone, indicate juror bias."  <u>Id.</u>

On the other hand, in <u>Porter v. Zook</u>, the Fourth Circuit found that a district court abused its discretion when it dismissed a defendant's actual bias claim without holding a hearing.  898 F. 3d 408.  In that case, the defendant faced the death penalty for killing a law enforcement officer in order to interfere with the performance of his official duties.  <u>Id.</u> During voir dire, the juror at issue answered positively the question of whether he has any family members in law

enforcement; he confirmed that his nephew was a police officer,
but omitted the fact that his brother was also a police officer
in the jurisdiction adjacent to that of the victim police
officer.  Id.  In finding that an evidentiary hearing was
necessary in that instance, the Fourth Circuit relied on
Williams v. Taylor, U.S. 420 (2000).  In Williams, a juror, when
asked on voir dire if she was related to any of the witnesses,
answered "no" because she did not consider herself "technically
related" to her ex-husband, who was listed as a witness; she
also failed to mention that the prosecutor in the case had
represented her in her divorce.  Id. at 440-442.  The Court
found that even if the juror was not technically related to her
ex-husband, "her silence . . . could suggest to the finder of
fact an unwillingness to be forthcoming; this in turn could bear
on the veracity of her explanation for not disclosing that [the
prosecutor] had been her attorney."  Id. at 441.  The Court
stated: "these omissions as a whole disclose the need for an
evidentiary hearing. It may be that petitioner could establish
that [the juror] was not impartial . . . or that [the
prosecutor's] silence so infected the trial as to deny due
process."  Id. at 442.

The Fourth Circuit found this language in <u>Williams</u> to mandate a hearing in <u>Porter</u>:

> To withhold information that one's brother was an
> officer in the adjacent jurisdiction certainly
> "suggest[s] ... an unwillingness to be forthcoming,"
> and at the very least, "disclose[s] the need for an
> evidentiary hearing." <u>Williams</u>, 529 U.S. at 441–42,
> 120 S.Ct. 1479. The district court failed to recognize
> the applicability of <u>Williams</u> and therefore erred in
> dismissing Appellant's actual bias claim as a matter
> of law without a hearing.

<u>Porter</u> at 426.  The court did not set forth a particularized standard for determining when, in other cases, a hearing is mandated.

Other circuits, however, have affirmed the broad discretion given to trial courts faced with juror bias claims. As stated by the Tenth Circuit:

> A court confronted with such a claim "has wide
> discretion in deciding how to proceed" and
> appropriately denies a hearing when a party presents
> "only thin allegations of jury misconduct." A hearing
> is not required when it would not be "useful or
> necessary" in determining whether a defendant's rights
> were violated.

<u>United States v. Brooks</u>, 569 F.3d 1284, 1288 (10th Cir. 2009) (internal citations omitted).

The Second Circuit further notes policy concerns with holding such post-trial hearings:

> We are always reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."  As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) (internal citations omitted).  The Second Circuit thus only requires a hearing "when a party comes forward with 'clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred[.]'"  Id.

The Eighth Circuit also provides trial courts with broad discretion, only requiring a hearing upon a sufficient showing of bias:

> The district court has broad discretion in handling allegations that jurors have not answered voir dire questions honestly, and we defer to its discretion in deciding whether a post-trial hearing is necessary. That discretion is not unlimited, however, and a movant who makes a sufficient showing of McDonough-type irregularities is entitled to the court's help in getting to the bottom of the matter.

United States v. Tucker, 137 F.3d 1016, 1026 (8th Cir. 1998) (internal citation omitted).

36

In exercising its discretion not to hold a hearing here, the court has carefully considered the merits of the defendant's claims as well as the consequences of holding such a hearing, and finds that the latter far outweighs the former. The facts here simply do not rise to the level of <u>Porter</u> and <u>Williams</u>. Juror A's potential knowledge stemming from pretrial publicity relating to facts of the case, and alleged failure to disclose it, while of modest concern, does not indicate bias at the level of <u>Porter</u>, where the juror failed to disclose that his brother, like the victim, was a police officer, or <u>Williams</u>, where the juror failed to disclose that her ex-husband was a witness and that the prosecutor had previously represented her. Rather, here, there are mere thin allegations that Juror A came into the case with allegedly prejudicial pretrial knowledge. The defendant does not present "'clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred,'" <u>Ianniello</u>, 866 F.2d at 543, but rather speculates that Juror A <u>may have</u> lied on voir dire because Juror A <u>could have</u> remembered facts from an article retweeted months prior, and that Juror A <u>may have</u> seen information related to the case when accessing Twitter during the trial. As discussed <u>supra</u>, those facts, without more, do not demonstrate that the defendant's Sixth Amendment right was violated. Without even a threshold showing of juror misconduct,

37

the court declines to expend its resources to allow the defendant to pry into a juror's pretrial conduct and fish for evidence of bias.

It has always "remain[ed] within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias, or in exceptional circumstances, that the facts are such that bias is to be inferred." McDonough, 464 U.S. at 556–57, 104 S.Ct. 845 (Blackmun, J., concurring) (emphasis added). The court finds it wholly unnecessary to exercise such option here.

### III.  Conclusion

Based on the foregoing discussion, it is ORDERED that the defendant's motion for a new trial on the basis of the alleged deprivation of his Sixth Amendment right to trial by an impartial jury be, and it hereby is, denied.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER:  February 8, 2019

John T. Copenhaver, Jr.
Senior United States District Judge

38