## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON

**UNITED STATES OF AMERICA**

**v.**

                                **CRIMINAL NO. 2:18-cr-00134**

**ALLEN H. LOUGHRY II**

### SENTENCING MEMORANDUM OF THE UNITED STATES

### Introduction

"Of all the criminal politicians in West Virginia, the group that shatters the confidence of the people the most is a corrupt judiciary. It is essential that people have the absolute confidence in the integrity and impartiality of our system of justice." Thus wrote the defendant, Allen H. Loughry II, in his book, *Don't Buy Another Vote, I Won't Pay for a Landslide*, at 294 (Gov. Trial Exhibit 16). And those very words apply to and, indeed, condemn Loughry, because he failed to live up to them. He did not act with integrity, but was corrupted by an inappropriate sense of power and entitlement, which resulted in his engaging in criminal conduct for seemingly trifling gains. That criminal conduct deserves stern punishment – not merely because of the nature and circumstances of the offenses of which the jury convicted him, but also to promote respect for the law, afford adequate deterrence, and provide a fitting punishment that will serve the ends of justice.

### Background

#### A. Offense conduct.

Loughry stands convicted of one count of mail fraud (18 U.S.C. § 1341), seven counts of wire fraud (18 U.S.C. § 1343), and two counts of making a false statement (18 U.S.C. § 1001(a)(2)). The jury also convicted him on a charge of witness tampering, charged as Count Twenty of the Second Superseding Indictment, but the Court entered a judgment of acquittal on

that count. The jury acquitted Loughry on ten counts of mail/wire fraud and hung on Count Eight, wire fraud. The United States elects not to retry Loughry on that count.[1]

Loughry's mail fraud conviction stems from his defrauding the Pound Civil Justice Institute of approximately $400 in the summer of 2014, when he claimed mileage to attend a conference in Baltimore, as if he had driven his own personal vehicle to the event when in fact he drove a Supreme Court vehicle. The mailing occurred when the Pound Institute mailed a check for the fraudulent mileage claim to Loughry at his home in Charleston.

The seven wire fraud convictions all relate to Loughry's using a government fuel card to buy gasoline for a Supreme Court vehicle for travel that was not for official business. Two of the convictions, Counts Five and Ten, involved purchases of gasoline by Loughry late at night, on a holiday or weekend (Thanksgiving Day, Nov. 28, 2013, for Count Five, and Sunday, January 19, 2014, for Count Ten), not long after he had already filled up the Supreme Court's vehicle with gasoline upon returning from a trip. The remaining five convictions for wire fraud – counts six, eleven, twelve, fifteen, and eighteen, involved travel by Loughry in a Supreme Court vehicle to The Greenbrier Resort, for book-signing events.

Finally, Loughry's two false statement convictions derive from the answers he gave to FBI Special Agent Jim Lafferty during an interview on March 2, 2018. During that interview, Loughry claimed that he never used a state vehicle for personal use and that he did not know that the desk he had in his home was a "Cass Gilbert" desk or even a desk anyone had ever claimed to be a Cass Gilbert desk.

---

[1] The United States has filed a notice of dismissal of Count Eight of the Second Superseding Indictment, per Fed. R. Crim. P. 48(a).

**B. Sentencing Guidelines.**

The Probation Office calculated the adjusted offense level for different groups of crimes for the counts of conviction, and the fraud group is the most serious. The Probation Officer properly calculated the total offense level as 14, *see* PSR ¶ 177, and the Criminal History Category as I. *See* PSR ¶ 189. Based on these calculations, Loughry's advisory guideline range of imprisonment is 15 to 21 months, *see* USSG Chapter 5, Part A – Sentencing Table, and the fine range is $7,500 to $75,000. USSG §5E1.2 (Fines for Individual Defendants).

Loughry objects to various aspects of the Probation Officer's guideline calculations. Specifically, he objects to the application of the following specific offense characteristics/adjustments:

- USSG §2B1.1(b)(9)(A) - offense involved a misrepresentation that defendant was acting on behalf of a government agency.      +3

- USSG §3B1.3 – role in the offense; defendant abused a position of public trust, which significantly facilitated the commission or concealment of the offense.      +2

- USSG §3C1.1 – obstruction of justice      +2

### Discussion

**A. The Court Should Overrule Loughry's Objections to the Guidelines**.

This Court should reject Loughry's objections to the guideline calculations, for the reasons that follow.

First, with respect to the specific offense characteristic found in USSG §2B1.1(b)(9)(A), that section specifies a three-level increase "[i]f the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization,

or a government agency."[2] The Fourth Circuit has approved an increase in analogous situations under an identical provision in USSG §2F1.1, which has since been replaced by USSG §2B1.1. The opinion in *United States v. Marcum*, 16 F.3d 599 (4th Cir. 1994), provides an example. Marcum was a corporal in the Logan County, West Virginia, Sheriff's Department and a president of a charitable organization known as the Logan County Deputy Sheriff's Association. *Id.* at 601. Marcum skimmed proceeds from public bingo games for the personal enrichment of himself and others. *Id.* The court affirmed a two-level increase under §2F1.1(b)(3), because Marcum had misrepresented to the public that he was conducting bingo games wholly on behalf of the Deputy Sheriff's Association when, in fact, he was acting in part for himself and his fellow officers. *Id.* at 603.

Similarly, in *United States v. Aramony*, 166 F.3d 655 (4th Cir. 1999), the court affirmed a two-level increase under USSG §2F1.1(b)(3), where Aramony misrepresented that he was acting wholly on behalf of United Way of America in soliciting donations. *Id.* at 664. The court in *Aramony* expressly reaffirmed its decision in *Marcum* and noted that an increase for a defendant "is appropriate even if the defendant did not misrepresent his authority to act on behalf of a particular organization, but rather only misrepresented that he was conducting an activity wholly on behalf of such organization." *Aramony*, 166 F.3d at 664. Thus, Aramony deserved the enhancement, because he misrepresented that he was acting on behalf of the United Way when he was really acting for personal greed. *See id.*

---

[2] Ordinarily, the enhancement is two levels, unless the resulting offense level is less than 10, in which case the offense level is increased to 10. USSG §2B1.1(b)(9)(A). Imposing an enhancement under this subsection does not require a direct misrepresentation. *See United States v. White*, 850 F.3d 667, 675 (4th Cir. 2017).

4

Here, Loughry's wire fraud convictions involved the false pretense that he was on official business, *i.e.,* acting on behalf of and for the benefit of a government agency (the Supreme Court of Appeals of West Virginia), when he fraudulently used the government fuel cards to purchase gasoline. Moreover, he expressly stated, falsely, that he had never used a Supreme Court vehicle for anything but official business and that he had driven a Supreme Court vehicle only in his capacity as a Justice. *See* Benjamin Trial Tr., Vol. II, pp. 10-11; Gov. Exhibit 69, p. 1. Loughry's wire fraud convictions therefore involved a misrepresentation that he was acting wholly on behalf of the Supreme Court, when he was really just acting for himself. The two-level increase called for by USSG §2B1.1(b)(9)(A) should be applied to Loughry.

Second, with respect to the adjustment for role in the offense under USSG §3B1.3, that section calls for a two-level increase "[i]f the defendant abused a position of public trust." Application Note 1 to the guideline states that "public or private trust" refers to a position "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). . . . For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.,* by making the detection of the offense or the defendant's responsibility for the offense more difficult)." USSG §3B1.3, comment. (n.1).

The Fourth Circuit's decision in *Marcum*, discussed above with respect to the application of USSG §2B1.1(b)(9)(A), also illuminates the analysis for abuse of trust. Not only was Marcum properly assessed with the two-level increase for misrepresenting that he acted wholly on behalf of the Sheriff's Association, Marcum properly received an adjustment for abuse of trust. He had abused his status as president of the Sheriff's Association. That position of trust provided him the opportunity to commit his crime in the first instance. *Marcum*, 16 F.3d at 603-04.

In this case, Loughry likewise held a position of public trust that contributed immeasurably to his committing the offenses. Indeed, his position of public trust was essential to his offenses. As a Justice and Chief Justice of the Supreme Court, there were no employees higher than he was in the organization. He possessed near limitless discretion in carrying out his duties and answered to no single individual. His autonomy and discretion were critical to his ability to commit the offenses in the first place and then to go for years before those crimes were uncovered. Thus, the two-level increase under USSG §3B1.3 applies to Loughry.

Finally, a two-level upward adjustment under USSG §3C1.1 applies to Loughry, because he committed perjury at trial. *See* USSG §3C1.1, comment. (n.4(b)) (upward adjustment for committing perjury). The adjustment pertains to defendants who testify falsely at trial. *See, e.g., United States v. Sun*, 278 F.3d 302, 313-14 (4th Cir. 2002). Three elements must be proven: (1) the defendant gave false testimony, (2) about a material matter; and (3) with willful intent to deceive. *United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011). Moreover, a court may find falsity based on the fact that the jury rejected a defendant's testimony. *See, e.g., United States v. White*, 810 F.3d 212 (4th Cir. 2016).

*White* is illustrative. In that case, White, the defendant, was charged with transmitting threats in interstate commerce. He testified at trial that he did not send the threatening emails; rather, he suggested someone else sent them. *Id.* at 230. The jury, however, found White guilty beyond a reasonable doubt, "clearly reject[ing] [White's] alternative theory of the crime." *Id.* At sentencing, the district court applied the two-level adjustment for obstruction of justice, noting "I can't imagine you not knowing what you had done. I think that was to obstruct justice; maybe get the jury to think that someone else other than you did it." *Id.* The Fourth Circuit affirmed, holding that the district court provided a sufficient basis for the two-level enhancement. "The observation

that the jury rejected [White's] testimony, and the court's comment that it could 'not imagine' [White] was unaware of sending the emails when he testified, established falsity and willfulness." *White*, 810 F.3d at 230.

Here, Loughry testified falsely and willfully at trial about material matters. Those matters included:

- Whether anyone ever told him anything about his desk when he was a law clerk;

- Whether Justice Benjamin had been in his office when he was a law clerk, and whether he had discussed his desk with Sara Thompson;

- Until December 2012, whether anyone ever told him anything about his desk;

- Whether he was asked his destination when he used one of the Supreme Court's vehicles;

- Whether he claimed mileage for his travels to and from a Pound Institute conference so that he could reimburse the State of West Virginia;

- Whether he intended to defraud the State of West Virginia or the Pound Institute, and whether he used Supreme Court vehicles for personal use; and

- Whether, prior to news reports about his desk, he had ever referred to the desk as a Cass Gilbert desk and whether he knew if anyone had ever claimed the desk was a Cass Gilbert desk.

Included with this Memorandum, as Attachment A, is a chart explaining the government's evidence, particularly testimony from government witnesses, which demonstrates the falsity of Loughry's testimony on the matters listed above. Furthermore, each of the matters was material, because each was very relevant to a charge or charges against Loughry. For example, Loughry's various statements about the Cass Gilbert desk directly pertained to the false statement charge in Count Twenty-five. Indeed, had the jury believed Loughry, it would have found him not guilty on that charge. Similarly, Loughry's testimony about his use of the Supreme Court's vehicles – whether he provided destinations, claimed mileage, or intended to defraud – were important to the

fraud charges of which he was convicted and the false statement charge in Count Twenty-three. Again, if the jury believed Loughry, it may well have acquitted him on some or all of those charges. Thus, Loughry's testimony on the matters listed above had "a natural tendency to influence, or [was] capable of influencing, the decision-making body to which [the testimony] was addressed." *United States v. Littleton*, 76 F.3d 614, 618 (4th Cir. 1996). Consequently, each of Loughry's statements in Attachment A was material, and the matters at issue were material.

Finally, Loughry willfully intended to deceive when he testified falsely. The manner in which he testified – his demeanor, his assurance in stating what he asserted to be the truth – evidenced his willful intent. His accusation that former Justice Benjamin was either "flat-out lying" or "misremembering," because "things were very contentious at the Court," Loughry Trial Tr., Vol. I, p. 106, also demonstrates willfulness. Loughry was not simply giving false testimony out of "confusion, mistake, or faulty memory." *Perez*, 661 F.3d at 193 (quoting *United States v. Dunnigan*, 507 U.S. 87, 96 (1993)). He was staking a claim – he was right, and Benjamin was a liar or conveniently "misremembering" things because of a bias against Loughry. *Cf. White*, 810 F.3d at 230 (district court explaining, "I think that [false testimony blaming another] was to obstruct justice; maybe get the jury to think that someone else other than you did it.").  And the sheer number of times Loughry testified falsely, particularly about the Cass Gilbert desk, and the stark contrast between his testimony and that of the other witnesses, stand as clear indicators of Loughry's willful intent to deceive.

In sum, Loughry testified falsely about material matters and with a willful intent to deceive. Because of his perjury at trial, Loughry deserves a two-level upward adjustment under USSG §3C1.1 for obstruction of justice.

**B. The Court Should Impose a Significant Sentence.**

Under any circumstance, the offenses of which Loughry stands convicted constitute serious crimes. In this case, however, the offenses are particularly egregious, because of Loughry's position of authority, his motives, the manner in which he committed the crimes, and the consequences of those crimes. Accordingly, and as discussed further below, consideration of the factors in 18 U.S.C. § 3553(a) weighs heavily in favor of a substantial term of imprisonment. In fact, an upward variance from the guideline range of imprisonment would be entirely appropriate.

1. *Section 3553(a)(1) – the nature and circumstances of the offenses and the history and characteristics of the defendant.*

To state the obvious, Loughry was a sitting Justice on the highest court in the State of West Virginia. It was his job, his duty, his solemn obligation, to apply and follow the law. Loughry's intentional criminal acts thus represent a betrayal of the trust placed in him by the public when it elected him to serve as a Justice. Moreover, his patterns of behavior related to and underlying his criminal activity and his motives for those criminal acts underscore the serious nature of his crimes and the need for a stern punishment.

For example, the evidence at trial revealed that Loughry continually and consistently acted dishonestly, from defrauding the Pound Civil Justice Institute in the summer of 2014 to defrauding the State of West Virginia for gas from 2013 – 2015, to lying to Special Agent Lafferty in March 2018. Even the witness tampering offense contained an element of dishonesty, as he made a false statement to Kim Ellis that he wanted her to agree with and adopt as fact – that he had "over and over and over" told Ms. Ellis to limit the costs of renovating his office to a level no higher than

the amounts spent on renovating the offices of two other Justices.[3] Loughry then compounded those crimes by testifying falsely at trial, as explained above.

Thus, the evidence at trial, including Loughry's own trial testimony, exposed him as an inveterate liar. His crimes involving dishonesty were not simply unique, stand-alone crimes. They formed a disturbing pattern, made all the worse by the fact that he was a Justice on the State's highest court.

There is another troubling aspect about Loughry. He retaliated against those who questioned or criticized him by accusing *them* of engaging in misconduct or criminal activity. He did it in October 2016, by calling the United States Attorney's Office about spending by then-Justice Robin Davis, who had questioned Loughry about his travel. Loughry Trial Tr., Vol. II, pp. 77-78. He did it again in October 2017 by calling then-United States Attorney Carol Casto about "ridiculous" spending at the West Virginia Supreme Court and blaming former Administrative Director Steve Canterbury, after it became apparent that Mr. Canterbury had discussed the spending with the media. Loughry Trial Tr., Vol. II, p. 79; Casto Trial Tr., pp. 5-8. He did it again in February 2018, when he called Special Agent Lafferty to report possible wrongdoing by Justice Margaret Workman in connection with the preparation of a will. Loughry Trial Tr., pp. 79-80. And

---

[3] Even though Loughry now stands acquitted of the witness tampering offense charged in Count 20, in fashioning an appropriate sentence the Court may nevertheless consider his conduct underlying that offense – his making a demonstratively false statement to Kim Ellis and other people on October 19, 2017 – as emblematic of his character. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *see also United States v. Lawing*, 703 F.3d 229, 241-42 (4th Cir. 2012) (affirming sentence that was based, in part, on acquitted conduct); *United States v. Ellis*, 975 F.2d 1061 (4th Cir. 1992) (affirming sentence based, in part, on dismissed count).

he continued this pattern of behavior during trial, when he essentially accused former Justice Benjamin of lying during his trial testimony. Loughry Trial Tr., Vol. I, at p.106.

Loughry's pattern of accusing others of wrongdoing when he faced scrutiny is disquieting not merely because it reveals his vindictiveness. His mean-spirited attempts to draw attention and blame away from himself demonstrate his utter lack of remorse for his own misconduct. In his view, those who went against him were either politically biased, lying, or guilty of crimes themselves, but he did nothing wrong.

Remorseless and vindictive, Loughry abused the power he possessed as a Justice, and Chief Justice, of the Supreme Court. His position of authority empowered him to carry out his crimes in the first instance. He could do as he pleased with the Supreme Court's vehicles and government fuel cards in committing the wire fraud offenses, because who would say no to him? He openly stated to Arthur Angus and Jess Gundy that no one had any business knowing where he was going when he took a vehicle. Angus Trial Tr., p. 20; Gundy Trial Tr., p. 28.

The totality of Loughry's behavior on the Supreme Court reveals an unbridled arrogance and a troubling sense of entitlement. In the final analysis it is those two unflattering characteristics that motivated his criminal activity. Quite simply, he committed the fraud and witness tampering crimes because he could. He had no real need for the small amounts of gasoline that he obtained by fraudulently using the government fuel cards. The amount he defrauded from the Pound Institute – $402.60 – is also relatively small. He had no need to lie to Special Agent Lafferty; indeed, he had no need to talk to Special Agent Lafferty at all. That he would voluntarily submit to an interview, and then lie during the course of it, is a further example of his unbridled arrogance, as is his willingness to lie under oath during trial. In the end, his "catch me if you can" attitude and

11

willingness to abuse his power are very troubling characteristics of Loughry, and they should weigh heavily in determining the appropriate sentence.

2. *Section 3553(a)(2)(C) – the need to protect the public from further crimes of the defendant.*

As noted above, Loughry has demonstrated no remorse for his criminal conduct. He contends he never did anything wrong, only others are to blame, and the allegations against him have been brought by people who are biased against him. His arrogance and willingness to abuse power would ordinarily be cause for concern and call for a sentence that would protect the public from further crimes by him. Nonetheless, the factor set forth in 18 U.S.C. § 3553(a)(2)(C)("to protect the public from further crimes of the defendant") does not figure substantially in this case, if only because it is not likely Loughry will ever again be entrusted with a high position of authority, with the power and discretion he had as a Justice. Indeed, should Loughry follow his own recommendation, he will never even practice law again. *See* Loughry, *Don't Buy Another Vote, I Won't Pay for a Landslide,* at 307 ("A lifetime ban from practicing law after committing a felony is warranted and necessary.") (Gov. Trial Ex. 16).

3. *Section 3553(a)(2)(A) and (B) – the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.*

The need for the sentence to reflect the gravity (as explained above) of Loughry's criminal conduct, promote respect for the law and provide a just punishment further support imposing a significant sentence of imprisonment. The sheer brazenness of his conduct, as well as the factors discussed above, call for such a sentence in order to reflect the serious nature of the crimes and to provide a just punishment.

The additional factors of promoting respect for the law and affording adequate deterrence are perhaps even more important as sentencing factors in this case. Loughry himself has

documented in his book the long and sordid history of corruption by public officials in the State of West Virginia. *See* Gov. Trial Exhibit 16. Unfortunately, the history of corruption in West Virginia is an ongoing saga.

General deterrence, therefore, is a vital factor to the sentencing in this case. Fraud and other venal crimes by public officials, particularly by those in high office, are committed in secret and are difficult to identify, investigate, and prosecute. These types of crimes, even for relatively minor gains, impose a tremendous social cost when finally exposed, for they weaken the public's trust and confidence in government and breed a cynicism that only encourages more crime, more corruption, and more wrongdoing.

A stern sentence in this case could have a significant impact on the State of West Virginia, by sending an important message – that those in high government office, charged as they are with safeguarding and preserving the public fisc and the community's wellbeing, must obey the law, lest they face severe consequences. Accordingly, a significant sentence, including a term of imprisonment above the guideline range of 15 to 21 months, or at least at the top of that range, and a fine within the guideline range of $7,500 to $75,000, imposed on a former Justice of the Supreme Court of Appeals of West Virginia for crimes committed while in office, would be entirely appropriate in this case. *See United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (affirming upward deviation from guideline range for a state senator convicted of obstruction of justice and making false statements to federal agents, where district court ultimately concluded, "There has to be a sense that we give to the public that we are going to safeguard the integrity of our system. . . . That we will hold our public officials to a higher standard, that we will hold our attorneys to a higher standard.").

13

## <u>Conclusion</u>

Corruption is a cancer that erodes the public's confidence in the government and undermines the rule of law. As the Supreme Court noted long ago, "a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562 (1961). These concepts are particularly applicable when the malefactor is a judge. Here again, Loughry's own words apply: "[T]he overriding public interest in preserving the integrity of the judiciary demands that justices, judges, magistrates, and attorneys be accountable for their damaging behaviors." Loughry, *Don't Buy Another Vote, I Won't Pay for a Landslide,* at 307 (Gov. Trial Ex. 16). Accordingly, the United States requests this Court to impose a sentence that includes a fine within the applicable guideline range, and a sentence of imprisonment with an upward variance from the guideline range of 15 to 21 months or, at the very least, at the top of that range. Such a sentence would be sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

MICHAEL B. STUART
United States Attorney

By:

s/Philip H. Wright
PHILIP H. WRIGHT
Assistant United States Attorney
WV State Bar No. 7106
300 Virginia Street, East
Charleston, WV  25301
Telephone:  304-345-2200
Fax:  304-347-5104
E-mail:  philip.wright@usdoj.gov

s/R. Gregory McVey
R. GREGORY McVEY
Assistant United States Attorney
WV State Bar No. 2511
300 Virginia Street, East, Room 4000
Charleston, WV  25301
Telephone:  304-345-2200, Fax:  304-347-5104
E-mail: greg.mcvey@usdoj.gov

15

## CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing "SENTENCING MEMORANDUM OF THE UNITED STATES" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing on this 11th day of February, 2019, to:

John A. Carr, Esq.
John A. Carr Attorney at Law, PLLC
179 Summers Street, Suite 209
Charleston, WV 25301


s/Philip H. Wright
PHILIP H. WRIGHT
Assistant United States Attorney
WV State Bar No. 7106
300 Virginia Street, East
Charleston, WV  25301
Telephone:  304-345-2200
Fax:  304-347-5104
E-mail:  philip.wright@usdoj.gov